**P. S. & E. INC., d/b/a Packing Seals & Engineering Co., Plaintiff-Appellant,**

v.

**SELASTOMER DETROIT, INC., a division of Microdot, Inc., and Microdot, Inc., Defendants-Appellees.**

No. 71–1629.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 29, 1972.

Decided Oct. 13, 1972.

Rehearing En Banc Denied Dec. 8, 1972.

Ronald S. Fishman, Chicago, Ill., for plaintiff-appellant.

Robert H. Joyce, Andrew M. Kramer, Chicago, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, and KILEY and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

This issue is whether it was error to grant defendants' motion for summary judgment where plaintiff seeks recovery of damages for defendants' alleged breach of an exclusive selling agency contract.

Plaintiff filed its complaint alleging that it was a corporation primarily engaged in selling packing seals and rings; that defendants (originally United Seal Incorporated but following a series of mergers, Selastomer Detroit, Inc., a division of Microdot, Inc., and Microdot, Inc.) and plaintiff orally agreed in 1965 that plaintiff would become the exclusive selling agency for defendants, exclu-

sive of certain designated markets, in connection with the sale and distribution of lip seal rings and packing seals and ring products manufactured by defendants; that plaintiff thereafter hired additional personnel, expended money for tooling and used its entire personnel to introduce defendants' products into the market, causing numerous prospective purchasers to test and consider defendants' products; and that in about June, 1968, after plaintiff devoted considerable effort in promoting defendants' products, defendants without cause breached and terminated the agreement and invaded the market supposedly belonging to the plaintiff, to plaintiff's substantial damage.

The complaint further alleged that the parties subsequently reduced a substantial portion of the previous oral agreement to writing. The complaint did not allege any specified term during which the agreement was to continue, but did allege that "Plaintiff was to continue as the sole and exclusive sales representative and organization" for defendants (par. 9) and that "it was the general custom during this time that once Plaintiff established a market for a particular product manufactured by Defendant, that the Plaintiff, as the exclusive selling agent of Defendant, would receive commissions from Defendant so long as the purchasers of Defendant's products continued to buy or purchase said products" (par. 10).

The plaintiff filed a timely jury demand.

The defendants moved to dismiss the complaint, alleging among other grounds, that it did not state a claim upon which relief could be granted since any agreements between the parties were terminable at the will of either party. The district court denied the motion, holding that whether the contract had a specific duration was a factual issue.

Thereafter the defendants filed an answer, admitting the existence of a contract with the plaintiff but affirmatively relying upon the absence of a claim because it was terminable at the will of either party.

The defendants then filed a motion for summary judgment on the ground that any agreements between the parties were terminable at the will of either party, relying upon the deposition of Don Dooley, plaintiff's president, wherein he had said:

"There was no time period set other than the fact that as long as we were doing a job for United Seal and United Seal was doing a job for us, we had consideration on both sides. We would continue."

Dooley also deposed that "Introducing a new line as well as a new concept was going to be a long haul" and "it was a long term program, to develop the customers and get seals applied and approved and into production."

In opposition to the motion for summary judgment the plaintiff filed an affidavit by Dooley in which he stated that "all parties clearly recognized that it would take at least three to five years of intensive selling in order to properly introduce the new item into the market." The affidavit also sets forth in some detail the efforts and expenses incurred by the plaintiff to start to develop the defendants' market, including the hiring of Frank Butler at a salary over a two-year period of $36,000.

Frank Butler's deposition is also part of the record. It reveals that he was one of four salesmen working for plaintiff in the promotion of defendants' products; that he alone worked on 40 to 50 accounts in an effort to sell defendants' products; that about the time when defendants purported to terminate the plaintiff's representation, he went to the defendants to seek employment and was hired; that he is one of five salesmen in the employment of the defendant; and that in March of 1971 (some six years after the plaintiff's agreement with the defendants), the defendants "really haven't broken into the market

yet. . . . They are still in the initial stages of getting into the industrial market" and that they have only one customer, who began buying in 1971.

Attached to Dooley's affidavit were twelve letters between the parties evidencing the on-going relationship during the time that plaintiff was promoting the sale of defendants' products. In the letter purporting to terminate the relation, the defendants stated to the plaintiff that although the relation had not been made "formal" to the extent of specifying a time of duration, "your company has been acting as a sales representative of United Seal for some time" and "our day-to-day relations have been satisfactory." Dooley's affidavit further stated that in addition to the twelve letters, "Affiant possesses several hundred additional letters which were sent between the companies verifying the orders and the work that was being done."

The district court took the position that since the agreement contained no provision as to its duration, it was terminable at the will of either party, thus absolutely foreclosing any right to damages. The court therefore granted summary judgment on behalf of the defendants. We reverse on the ground that there are genuine issues of material fact upon which reasonable minds may differ, precluding the granting of summary judgment.

■ At the outset it should be noted that the parties are not in agreement in regard to the law to be applied. In diversity cases a federal court must follow the conflict of laws principles prevailing in the state in which it sits. Klaxon Company v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L. Ed. 1477 (1941). Under Illinois conflict of law principles, the law of the place of performance governs the construction and obligations of the contract when the place of making and place of performance differ, if the agreement is to be wholly performed in one jurisdiction. If more than one place of performance is involved, the place of making of the contract governs its construction and obligations. Oakes v. Chicago Fire Brick Co., 388 Ill. 474, 58 N.E.2d 460 (1944).

■ Defendant Selastomer Detroit, Inc. (and its predecessor United Seal) has its principal place of business in Michigan and plaintiff's principal place of business is in Illinois. The conversations leading up to and constituting the oral agreement took place in Detroit, Michigan, and Chicago, Illinois. The correspondence attached to Dooley's affidavit and relied upon as evidence of the terms of the contract was mailed between Detroit and Chicago. Performance of the contract was contemplated on a national scale but was realistically limited to the states where the plaintiff had "salesmen actively calling" that is, Illinois, Wisconsin, Minnesota, Iowa, Indiana and Michigan. The headquarters for performance was Chicago.

There appears to be no Illinois authority which would clearly govern such a multi-faceted situation where the performance was to occur in several states and the place of making was arguably in Michigan or Illinois. We can only presume that if faced with this problem in view of its prior contract law and the analogous modern tort cases relying upon the "most significant contacts" rule, Illinois courts would probably find here that Illinois had the most significant contacts and that its law should govern. Ingersoll v. Klein, 46 Ill.2d 42, 262 N.E.2d 593 (1970).[1]

■ It is simple and doubtlessly correct to conclude that under Illinois law a

1. Section 1–105 of the Uniform Commercial Code, which has been adopted in Illinois and applies to sales contracts, provides that unless the parties agree upon the applicable laws, "this Act applies to transactions bearing an appropriate relation to this State."

contract which fails to fix a time for its duration and calls for continual performance is ordinarily terminable at the will of either party. Joliet Bottling Co. v. Joliet Citizens' Brewing Co., 254 Ill. 215, 98 N.E. 263 (1912); Schoen v. Caterpillar Tractor Co., 103 Ill.App.2d 197, 243 N.E.2d 31 (1968).

■ This conclusion does not end the matter under the facts of this case, however. In Fargo Glass & Paint Co. v. Globe American Corp., 161 F.2d 811 (7th Cir. 1947), where the defendant, as here, contended that it could terminate a distributor contract of indefinite duration with impunity, this Court disagreed, saying at page 813:

"No controlling Illinois authority has been cited, nor have we found any. The rule which we think has some application here was clearly enunciated by the Missouri Court of Appeals in Beebe v. Columbia Axle Co., 233 Mo.App. 212, 117 S.W.2d 624, 629: 'The limitation is that, in any case of an indefinite agency where it is revoked by the principal, if it appears that the agent, induced by his appointment, has in good faith incurred expense and devoted time and labor in the matter of the agency without having had a sufficient opportunity to recoup such from the undertaking, the principal will be required to compensate him in that behalf; for the law will not permit one thus to deprive another of value without awarding just compensation. The just principle acted upon by the courts in the circumstances suggested re-

quires no more than that, in every instance, the agent shall be afforded a reasonable opportunity to avail himself of the primary expenditures and efforts put forth to the end of executing the authority conferred upon him and that, if such opportunity is denied him, the principal shall compensate him accordingly.' "

The district court in this case believed that the *Fargo* holding had somehow been diluted in its effect by this Court's subsequent opinion in Wm. J. Lemp Brewing Co., v. Ems Brewing Co., 164 F.2d 290 (7th Cir. 1947). *Lemp* did not deal with the issue raised in the above-quoted portion of *Fargo*. In *Lemp* the contract bound the defendant to pay royalties based upon the sale of beer manufactured and sold by the defendant under the Lemp name. No agency was involved and hence no questions arose as to an agent's good faith incurring of expenses without receiving a reasonable opportunity to recoup those expenses.

We have not discovered any Illinois case which disavows *Fargo* either directly or indirectly.[2] Analogous Illinois cases support it. The Illinois Supreme Court has subscribed to the rule that "Every contract implies good faith and fair dealing between the parties to it . . ." Martindell v. Lake Shore National Bank, 15 Ill.2d 272, 154 N.E.2d 683, 690 (1958). *See also* Rees v. Bank Building and Equipment Corp., 332 F.2d 548, 551–552 (7th Cir.), cert. denied, 379 U.S. 932, 85 S.Ct. 332, 13 L.Ed.2d 344 (1964).[3]

2. In Superior Concrete Accessories v. Kemper, 284 S.W.2d 482 (Mo.1955) where the Missouri Supreme Court purported to apply Illinois law, *Fargo* was cited with approval and the court held that twelve years' performance under an agency contract gave the agent ample opportunity to recoup its expenses.

3. The defendants rely to a great extent upon Goodman v. Motor Products Corp., 9 Ill.App.2d 57, 132 N.E.2d 356 (1956), but in that case the court took pains to

avoid the issue of the agent's unrecouped burden by stressing that Goodman had no burden, saying at 132 N.E.2d 366: "Goodman surrendered nothing to Motor Products when he made the agreement to become its export distributor. In fact, he did not even promise to continue the distributorship after he got it. He did not obligate himself to make the arrangement permanent. In so far as this record shows, Goodman walked in off the street looking for a job and he wound up with

Illinois courts have also recognized quasi-contracts founded upon the fundamental principle of justice that no one ought to unjustly enrich himself at the expense of another. United States v. O. Frank Heinz Construction Co., Inc., 300 F.Supp. 396, 400 (S.D.Ill.1969); Beatrice Foods Co. v. Gallagher, 47 Ill.App. 2d 9, 197 N.E.2d 274, 284 (1964). *See also* Herrmann v. Gleason, 126 F.2d 936, 940 (6th Cir. 1942).

We conclude that if the Illinois courts were confronted with the *Fargo* question they would dispose of it as the *Fargo* opinion did by holding that the plaintiff is entitled to relief if it can prove to the satisfaction of a jury the facts which it has alleged.

The plaintiff here is entitled to its jury trial. When the plaintiff has presented all of its evidence, the trial court can then determine whether the agreement between the parties was absolutely indefinite as to duration and terminable at will as a matter of law, or whether the proof is sufficient to permit the jury to determine that question as a matter of fact. But in any event, the jury must determine, regardless of whether the contract was terminable at will, whether the plaintiff suffered damages as the result of incurring expense and devoting time and labor in the matter of the agency without being afforded a sufficient opportunity to recoup from the undertaking, as required by *Fargo*.

Therefore, it was error to grant the summary judgment. Consolidated Laboratories, Inc. v. Shandon Scientific Co., 413 F.2d 208 (7th Cir. 1969); National Gas Appliance Corp. v. Manitowoc Co., Inc., 311 F.2d 896 (7th Cir. 1962).

Reversed and remanded for further proceedings.

---

a job of 'export manager' for Deepfreeze Division of Motor Products Corporation. There is no evidence that Goodman invested any money in the business. He was given a desk in the offices at the plant and paid no rent. Whenever inquiries from abroad came to the company, they were turned over to him and he took the order for home freezers if he could get an order."