**HARTFORD ACCIDENT AND INDEMNITY COMPANY, a corporation,**
Plaintiff,

v.

**Way CRIDER d/b/a Crider & Sons Boring and Jacking Company,**
Defendant.

**Santucci Constructions Co., Intervening Defendant.**

**No. 71 C 1742.**

United States District Court,
N. D. Illinois, E. D.

Dec. 23, 1974.

John G. Poust, Jerome N. Groark, Hackbert, Rooks, Pitts, Fullagar & Poust, Chicago, Ill., for plaintiff.

Bissonnette, Nutting & Vogt, Kankakee, Ill., for defendant.

O'Brien & Trittipo, Chicago, Ill., for intervening defendant.

## MEMORANDUM OPINION

MARSHALL, District Judge.

Before me are cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56(c), filed by the plaintiff Hartford Accident & Indemnity Company (hereinafter "Hartford"), the defendant, Wayne Crider, d/b/a Crider & Sons Boring & Jacking (hereinafter "Crider"), and the intervenor, Santucci Construction Company (hereinafter "Santucci"). The underlying action is Hartford's suit for declaratory judgment to determine its duties and liabilities under a general liability insurance policy is-

sued to Crider. Santucci was granted leave to intervene. Jurisdiction is based on diversity of citizenship.

The facts surrounding this litigation are not in substantial dispute. Crider was in the business of boring and jacking, excavation work and the construction of underground tunnels. On September 3, 1969, Hartford issued a manufacturers' and contractors' liability insurance policy (No. 83MC242208) to Crider for a premium of $1,887.

Thirteen months later, on November 10, 1970, Santucci filed a civil action against Crider in the Circuit Court of Cook County, Illinois,[1] alleging that it had a contract with the Sewer Commission of Freeport, Illinois, for the construction and installation of sanitary and storm sewers. A portion of the contract was subcontracted to Crider on February 11, 1970. By the terms of the subcontract[2] Crider was to install sewer lines under U. S. Route 20 for a distance of 100 linear feet. The method of installation is described by the parties as pipe jacking. More specifically,

> Out of a shaft excavated at or near the point of commencement of defendant's [Crider] construction, a length of 60-inch diameter steel pipe was to be forced hydraulically part way into the face of the subsurface to be exca-

vated. Laborers (miners and muckers) would then excavate the earth from inside the casing; as the excavation progressed, the steel casing was continuously jacked forward into the earth. This operation would continue until the entire length of the construction was excavated and lined with the 60-inch steel pipe. Thereupon, with the steel pipe as a carrier the sewer was to be constructed using joined lengths of 42-inch reinforced concrete pipe placed within the steel casing.[3]

Santucci further alleged in the state action that Crider breached his contractual duty of ordinary care and failed to use good workmanship. The specific breaches are enumerated in paragraph seven of the amended state court complaint.[4] As a consequence of these breaches, Route 20 allegedly "subsided," resulting in severe damage not only to Route 20 and the underlying soil supports, but also to the underground construction already performed.[5] Because of this damage Crider was dismissed and Santucci had to complete the work by "open cutting," a more expensive operation. This work and restoring the grade to Route 20 constitute Santucci's $112,000 claim of damages.

For reasons which are set out more fully later, the exact nature of what

---

1. Santucci Construction Co. v. Wayne Crider, Civil No. 70 L 14288. A copy of the amended complaint is attached to Hartford's motion for summary judgment as Exhibit "C".

2. A copy of the subcontract is attached as Exhibit "C", Hartford's motion for summary judgment.

3. Amended Complaint, Santucci Construction Co. v. Wayne Crider, Civil No. 70 L 14288. A copy of the amended complaint is attached as Exhibit "C", Hartford's motion for summary judgment.

4. 7. That notwithstanding his duties as aforesaid and in breach of his contract with plaintiff and in breach of his duty to exercise ordinary care, the defendant was guilty of one or more of the following wrongful acts:
 (a) Failed to provide supervision during the jacking work leaving the management of the operation in the hands of laborers.

 (b) Failed to use the steel rings furnished by plaintiff to stabilize the installation of the 60-inch pipe and support the subsurface ground loads.
 (c) Failed to bulkhead or otherwise protect the face of the excavation so as to prevent or control fine and loose materials from running into the excavation and the casing.
 (d) Failed to take measures consistent with good workmanship to prevent the formation of voids above the excavated area and the resultant settlement of surface structures.
 (e) Otherwise breached its contract with plaintiff by conducting the work in an unworkmanlike, inadequate and defective manner and otherwise carelessly and negligently conducted and managed the operation described heretofore.

5. Amended Complaint, *supra*, note 3, at ¶¶ 8, 9.

happened to Route 20 is important. Therefore, a summary of the affidavits of Rufus A. Weaver and George S. Woselowsky, employees of Santucci who were present during Crider's work, will be helpful in ascertaining what happened on the construction site.[6]

George Woselowsky is presently employed by Santucci. Between February 12, 1970, and March 13, 1970, he was the job superintendent on the Freeport contract. During this period he observed Crider's work and the damage to Route 20. Problems with the construction began on February 20, 1970, but the damage to Route 20 was not noticed until March 6, 1970, when Illinois State Highway Department officials observed a one or two inch dip in the road. By March 9, however, the dip had reached four and one-half inches in its deepest depression, and by March 10, the depth was estimated at seven inches. Woselowsky's last personal observance of Route 20 was on March 13; on that date the dip was 10 to 12 inches. On May 2, 1970, the Highway Department ordered the damaged portion of Route 20 closed or rerouted and the road open cut so that the remainder of the sewer work could be completed and the road repaired.

Between February 12, 1970, and March 13, 1970, Woselowsky also stated that the surface of the roadway at the top edge never moved away from adjacent surface and collapsed suddenly into the excavation. "The movement of the road and ground beneath it resulted in a slow, gradual, steady lowering of the elevation of the road surface which, . . . took place over a period of many days."[7]

Rufus Weaver is also employed by Santucci. He became the Freeport job superintendent on March 16, 1970. He was, however, present at the construction site between February 27, 1970 and May 4, 1970. During this period he observed Crider's work and the accompanying problems with Route 20. To the extent Weaver and Woselowsky were on the job at the same period, Weaver supports Woselowsky's affidavit.

Subsequent to March 13, 1970, the last day Woselowsky observed the problems with Route 20, Weaver stated the road continued to subside. By May 2, 1970, the surface of the road gradually dropped 10 feet below its original elevation. Between March 9 and April 27, the subsidence was corrected by asphalt paving. During this period, the road dip widened from approximately 50 feet to 80 feet.

Weaver further stated that at no time did the "surface of the roadway at the top edge ever break away from the adjacent surface and collapse suddenly into the underground excavation. The movement of the road and the ground beneath it resulted in a slow, gradual, steady lowering of the elevation of the road surface which . . . took place over a period commencing, at the latest, March, 6, 1970, and ending on or about April 27, 1970."[8]

As a result of Crider's alleged breach of contract and the resulting damages to Route 20, Santucci filed the aforementioned state action against Crider, who tendered defense of the suit to the Hartford, believing the alleged damages were covered under the policy of casualty insurance. Hartford denied liability under the terms of the policy, but obtained counsel for Crider to defend the state action under a reservation of rights. Thereafter Hartford filed this suit for a declaratory judgment asking this court to hold that the damages alleged in Santucci's amended state complaint are not covered by the policy. Hartford then filed the instant motion for summary judgment. Concomitantly, Santucci and Crider filed cross-motions for summary judgment asking this court to hold that

6. The affidavits of Weaver and Woselowsky were submitted by Santucci along with its motion for summary judgment.

7. Affidavit of George S. Woselowsky, April 3, 1974, at ¶2.

8. Affidavit of Rufus A. Weaver, April 3, 1974, at ¶7.

the damages alleged in Santucci's complaint are covered by the policy issued to Crider. The parties' briefs have raised numerous arguments, all of which will be considered after a brief discussion of the applicable principles of law.

■ Rule 56(c) provides that a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there are no genuine issues as to any material fact and the moving party is entitled to a judgment as a matter of law. As a procedural matter, the granting of a motion is a drastic remedy which is available only upon a clear showing that no material issues of fact remain for trial. Mintz v. Mathers Fund, 463 F.2d 495 (7th Cir. 1972). *Accord,* Kirk v. Home Indemnity Co., 431 F.2d 554 (7th Cir. 1970).

■■ In the present case there is no factual dispute disclosed by the pleadings and affidavits. At most, the parties disagree on what label should be attached to the facts. Hartford's liability under the policy turns on the construction of several policy exclusions; this presents a question of law for the court. Hartford Accident & Indem. Co. v. Case Foundation Co., 10 Ill.App.3d 115, 294 N.E.2d 7, 11 (1st Dist. 1973); 6 J. Moore, Federal Practice, ¶ 56.17[31], at 2561 (1974). And each movant has the burden of establishing the facts that entitle him to judgment are not in dispute. *Id.* at 2563. *See generally,* Thoresen v. Roth, 351 F.2d 573 (7th Cir. 1965).

■■ The final preliminary matter is the applicable choice of law rule. The parties' briefs refer to decisions of many different states and various federal circuits. Since this is a diversity action, the substantive law of Illinois as well as its applicable conflicts of laws decisions are controlling. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Erie R. R. Co. v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Under Illinois conflicts of law decisions, the validity, construction, and obligation of a contract must be determined by the law of the place where it is made or to be performed. Harris v. American Surety Co., 372 Ill. 361, 24 N.E.2d 42 (1939); Ryan v. Napier, 252 F.Supp. 730 (N.D. Ill.1966). Therefore, Illinois law is controlling, since the contract was made in Illinois and covered work being performed in Illinois.

The first issue presented by the motions is whether an action for declaratory judgment lies when the insurer denies liability in full and defends under a reservation of rights. This issue is raised by Crider in his cross-motion for summary judgment.[9] And although his papers are not altogether clear, he appears to assert that an action for declaratory judgment is improper because of the difficulties in determining which damages are excluded under the policy's terms. Crider suggests that any claim of exclusion should be raised by Hartford in a garnishment proceeding if Santucci prevails in the state action.

■ This argument is without merit. The rule in Illinois is that an insurer has the duty to defend the insured when a complaint is filed and it arguably states facts that bring the case within the policy's coverage. If there is potential coverage but the insurer believes it has valid defenses based upon exclusionary provisions of the policy, it has two options. One, it may secure a declaratory judgment of its rights while defending the potential insured under a reservation of rights. Or two, it may defend the potential insured under a reservation of rights and seek to adjudicate its rights by a supplemental suit. If the insurer refuses to follow either of these procedures and does not defend when there is potential coverage, it is estopped to raise the exclusionary defenses in a subsequent action against it by the insured. John Mohr & Sons v. Hanover Ins. Co., 322 F.Supp. 184 (N.D.Ill.1971);

9. Santucci does not make this argument.

Gulf Ins. Co. v. Dooley, 286 F.Supp. 16 (N.D.Ill.1968); Fragman Const. Co. v. Preston Const. Co., 1 Ill.App.3d 1002, 274 N.E.2d 614, 616 (2d Dist. 1971); *see* Sims v. Illinois Nat. Cas. Co., 43 Ill. App.2d 184, 193 N.E.2d 123 (3d Dist. 1963).

■ Hartford is presently defending Crider under a reservation of rights. Therefore, Hartford may bring this declaratory judgment action to protect its rights under the exclusionary provisions in the policy. Crider's motion on this issue is Denied.

The next issue, and the one most vigorously argued by the parties, is whether the "collapse hazard" exclusion excludes liability for the damages alleged by Santucci. The policy provides:

I. COVERAGE B — PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

\*　　\*　　\*　　\*　　\*　　\*

Coverage B, *property damage*

Property damages is defined as follows:

"*property damage*" means injury to *or* destruction of *tangible* property. (emphasis supplied)

The Hartford policy further provides in pertinent part that the policy does *not* apply:

I. (o) to *property damage* included within:

\*　　\*　　\*　　\*　　\*　　\*

(2) the *collapse hazard* [unless purchased] . . . .

The policy defines collapse hazard as follows:

"*Collapse Hazard*" includes structural property damage as defined herein and *property damage* to any other property at any time resulting therefrom. "Structural property damage" means the collapse of *or* structural in-

jury to any building or structure due to (1) grading of land, excavating, burrowing, filling, back-filling, tunnelling, pile driving, cofferdam work or caisson work *or* (2) moving, shoring, underpinning, raising or demolition of any building *or* structure *or* removal or rebuilding of any structural support thereof.

There is no question that Crider did not purchase the collapse hazard coverage, although he apparently could have. The issue is whether the allegations in Santucci's amended state complaint allege damages excluded under the collapse hazard.

Hartford argues that the collapse hazard excludes coverage for the damage to Route 20 for four reasons:

1. Route 20 collapsed due to Crider's operation.

2. Route 20 was structurally injured due to Crider's operation.

3. Route 20 collapsed due to the "removal" of its "structural support" (formation of voids in the subsurface).

4. Route 20 was structurally injured due to the "removal of" its "structural support." [10]

Hartford also argues the damage to the casings is excluded under the collapse hazard. For reasons fully set out below, the latter damage is excluded under several other policy exclusions. Therefore, the applicability of the collapse hazard to this particular type of damage need not be considered.

Santucci and Crider make several arguments opposing the Hartford's interpretation of the collapse hazard exclusion. They first argue the road "subsided" and did not collapse. Then they argue that there was no collapse of or structural injury to any structure because the rule of *ejusdem generis* limits the meaning of "structure" to a structure similar to a building. Consequently, the exclusion is inapplicable to a highway.

10. Hartford's memorandum in support of its motion for summary judgment at 9.

The parties have cited many cases discussing the meaning of collapse. A review of the Illinois decisions reveals that the word collapse has a distinctive meaning. The loss must be sudden and the structure's basic character must be lost. In cases involving buildings, courts have held that the building must have been reduced to mere ruin, a mass of rubbish, or congeries of material, or that it could not be repaired and be the same building. LaSalle Nat'l Bank v. American Ins. Co., 14 Ill.App.3d 1027, 303 N.E.2d 770, 774 (1st Dist. 1973); Kaplan v. Interstate Fire & Cas. Co., 35 Ill.App.2d 400, 182 N.E.2d 766 (2d Dist. 1962) (abstract only); Rubenstein v. Fireman's Fund Ins. Co., 339 Ill.App. 404, 90 N.E.2d 289 (4th Dist. 1950). Based on the uncontradicted affidavits of both Woselowsky and Weaver, the damage to Route 20 was not sudden; it extended over a period of approximately one month. Therefore, even though there is a material issue of fact on the question of whether the road was reduced to a mere ruin, there could not be a collapse as that word has been defined by Illinois decisions. Furthermore, Hartford is chargeable with the interpretation Illinois courts have placed on the word collapse. *Cf.* Fidelity & Cas. Co. v. Waterman, 161 Ill. 632, 636, 44 N.E. 283, 284 (1896).

Hartford argues that even if there was no collapse, there was structural injury to a building or structure, and as a result, the damage to Route 20 is not covered. Santucci and Crider counter that while there may have been structural injury to Route 20, there was not structural injury to a structure because the meaning of structure is limited to structures resembling a building, and a highway does not resemble a building. Only two cases considering a collapse hazard clause similar to the one at issue have been cited. The better reasoned case is Associated Indem. Corp. v. Bur-Tex Constructors, Inc., 444 S.W.2d 338, (Tex.Civ.App.1969) (application for writ of error refused, no reversible error).[11]

The facts in *Bur-Tex* are very similar to the present case. The insured was installing an underground oil sewer line. In the course of the installation the insured's workmen came to an area where a cement encased electrical conduit pipe was buried. Because the conduit crossed the path of the proposed excavation, the insured decided to burrow under the conduit since the sewer line was going to run much deeper than the conduit. A tunnel was constructed under the conduit while the workmen built a surface harness to support the conduit. Just as the sewer pipe was being placed in the tunnel, the tunnel and the sides of the trench collapsed, causing the conduit's cement casing to break, damaging many of the electrical wires inside.

The insured was covered by a general contractor's liability policy that contained a collapse hazard exclusion identical to Hartford's. The court analyzed the policy provision as follows:

> The insurance company says that since the word "structure" may mean "building", it is clear that by naming "building" and placing "or" after it, that the meaning of "building" was excluded from "structure". Appellant argues that since the plain and ordinary meaning of "or" is disjunctive, it denotes alternatives as well as mutually exclusive choices and "structure" was placed in the contract to describe something other than "building". Appellees, on the other hand, contend that the words "any build-

---

11. Hartford relies on General Const. Co. v. Aetna Cas. & Surety Co., 151 Conn. 684, 202 A.2d 146 (1964), to support its interpretation of the collapse hazard clause. The court held without discussion that the collapse of a retaining wall was not a risk assumed by the insured because of a collapse hazard exclusion similar to Hartford's.

There was no discussion of *ejusdem generis* or whether the retaining wall was so like a building that it was a building and not a structure under the policy's language. To the extent *General* can be said to support the Hartford interpretation of the collapse hazard exclusion, the case is not followed.

ing or structure" as used in the exclusion of the insurance policy must be defined to encompass things similar to buildings, such as bridges, towers, large chimneys, oil and gas storage tanks, and like structures. We agree with appellees for several reasons.

The relatively specific word "building" when used alone and where it is followed immediately by a more generic word which includes within its meaning the foregoing category "building", the latter general word should necessarily be limited to like things such as buildings. The rule of ejusdem generis means literally, "of the same kind". The rule is designed to aid in the interpretation of general words which follow a specific word or words and are construed to embrace objects similar in nature. The general word is not to be construed in its broadest sense but is held to apply to things of the same kind or class as specifically mentioned; that is: in a more restricted sense.[12]

The court concluded that since the conduit was not a structure like a building, the damage to the conduit was not excluded under the collapse hazard clause.

 The reasoning of the court in *Bur-Tex* is applicable to the present case. Illinois follows the rule of *ejusdem generis*. Gullett v. St. Paul Fire & Marine Ins. Co., 446 F.2d 1100 (7th Cir. 1971); Bituminous Cas. Corp. v. Chicago Rock Island & Pac. R. R. Co., 8 Ill.App.3d 172, 175, 289 N.E.2d 464 (3d Dist. 1972); Woods v. Great Amer. Ins. Co., 265 Ill.App. 20, 23 (3d Dist. 1932.).[13] Furthermore, the word structure has both a broad and narrow definition. It can mean anything that is built or con-

structed, Brown v. City of Decatur, 188 Ill.App. 147, 151 (1914), or it can mean an edifice or building of any kind. Stewart v. Welsh, 142 Tex. 314, 178 S. W.2d 506, 508 (1944); Black's Law Dictionary, 1592 (4th ed. 1951). The word's meaning may not be taken in isolation; its denotation must be ascertained by looking to the preceding language in the policy. *See* New York Cen. R. R. Co. v. General Motors, Co., 182 F. Supp. 273, 286 (N.D.Ohio 1960); Stewart v. Welsh, *supra*. The use of the specific word building immediately followed by the word structure, requires that structure be taken in its narrow sense. Otherwise building is unnecessary since structure would, in the broad sense, include a building. Therefore, the word structure is limited to mean structures such as buildings. And since a highway is not a structure as defined, the collapse hazard exclusion does not bar recovery for the damages alleged in Santucci's state complaint.

The next issue is whether any of the alleged damages are excluded because of exclusion I.(i), which provides that the policy does not apply,

(i) to property damage to

(1) property owned or occupied by or rented to the insured;

(2) property used by the insured, or

(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control.

Hartford argues this clause excludes recovery for damages to the steel casings being jacked by Crider. The casings were allegedly damaged because Crider

---

12. 444 S.W.2d at 341.

13. Hartford argues in its reply to Santucci's memorandum in support of summary judgment that under Illinois law *ejusdem generis* is not applicable when the general intent of the parties is clear. While expressing no opinion on this proposition, the intent of the parties is not clear in this case. Hartford also argues *ejusdem generis* is not applicable because the language of the exclusion is

in the disjunctive, "building or structure" and does not use the word "other." While admittedly most cases applying *ejusdem generis* invoke a number of specific related items, followed by or "other" similar items, the use of "other" is not a talisman. In an appropriate case, the meaning of a general word can be limited by an immediately preceding specific word. *See, e. g.*, Bituminous Cas. Corp. v. Chicago Rock Island & Pac. R. R. Co., *supra*, 8 Ill.App.3d at 174–75, 289 N.E.2d 464.

failed properly to counteract the downward pressure of Route 20 upon them.

Several Illinois cases have considered the exact type of exclusion in question. Bituminous Cas. Corp. v. Chicago & R. I. R. R. Co., *supra*; Leiter Elec. Co. v. Bituminous Cas. Corp., 99 Ill.App.2d 386, 241 N.E.2d 325 (3d Dist. 1968); Maryland Cas. Co. v. Holmesgaard, 10 Ill.App.2d 1, 133 N.E.2d 910 (2d Dist. 1956). These cases look to the nature of the possessory control exercised by the insured. If the control is a limited possession or temporary access, the exclusion does not apply, but if the possession is, for example, a bailment, then the exclusion does apply. Santucci entrusted Crider with the steel casings used in the jacking. He used the casings for several weeks until he was dismissed. Damage to this possession is sufficient to invoke exclusion (i)(3). Therefore the damage to the casings is excluded.

Although damage to the casings is excluded, damage to other property is not excluded since Crider had care, custody, and control of only the casings. *See* Geddes S. Smith, Inc. v. St. Paul Mercury Indem. Co., 63 Cal.2d 602, 47 Cal.Rptr. 564, 407 P.2d 868 (1965); Liberty Building Co. v. Royal Indemnity Co., 177 Cal.App.2d 583, 2 Cal.Rptr. 329 (1960); Hartford Accident & Indem. Co. v. Olson Bros., Inc., 187 Neb. 179, 188 N.W.2d 699 (1971).

Hartford also argues the damage to the casings is not covered because of exclusion I.(1) providing that the policy does not apply

(1) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.

In the instant case there was property damage to the work performed by Crider. Specifically the casings were damaged. The exclusion is applicable to this damage. For the reason stated under the discussion of exclusion (i), exclusion (1) does not exclude any other damages.

The next contention made by Santucci and Crider is that the underground property hazard coverage purchased by Crider, covers all the damage occasioned by the alleged breach. The applicable section reads as follows:

"[U]nderground property damage hazard" includes underground property damage as defined herein and property damage to any other property at any time resulting therefrom. "Underground property damage" means property damage to wires, conduits, pipes, mains, sewers, tanks, tunnels, any similar property, and any apparatus in connection therewith, beneath the surface of the ground or water, caused by and occurring during the use of mechanical equipment for the purpose of grading land, paving, excavating, drilling, borrowing, filling, backfilling or pile driving. . . .

Hartford correctly argues that the damage to the casings is not covered under the above provision because that damage is excluded under (i) and (1). Furthermore, the other alleged damage is to Route 20, which is not below the surface of the ground and therefore is not covered. Crider and Santucci also argue the right of way was damaged, but the language of the provision, applying the rule of *ejusdem generis* would not cover a right of way.

The final argument is raised by Hartford. It argues that Santucci cannot recover lost profits under the policy. Hartford Accident & Indem. Co. v. Case Foundation Co., 10 Ill.App.3d 115, 294 N.E.2d 7 (1st Dist. 1973). Santucci argues that the ad damnum covers only the cost of completing the project and includes no profit.[14] Hartford responds that since Santucci had to complete the project by a more expensive method— open cutting—this added expense represents lost profits.

14. Deposition of Carlo Santucci, December 11, 1973, at 68–69.

The policy provides that "[T]he Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of property damage." Property damage is defined as "injury to or destruction of tangible property."[15] Santucci's amended state complaint alleges negligence and breach of contract by Crider. As a result of Crider's conduct, there was damage to tangible property, specifically the casings, Route 20, the right of way and other materials used on the project. Santucci alleges property damage to tangible property and under the policy Hartford is obligated to pay those damages if Crider is found liable.

Hartford places great reliance on *Case* to support its position. In that decision the court stated that "because of breaches and negligence by Case, Skidmore and Tishman, there were delays in the construction of the . . . Hancock Center causing . . . [lost] financing commitments and anticipated profits. A different case would have been stated had . . . [there been an] alleged injury to or destruction of property by Case, Skidmore and Tishman which produced the *claimed damages.*"[16] Santucci is not alleging delay and damages as a result thereof. It is claiming physical, tangible property damage as previously noted. Moreover, there are strong indications in *Case* that if there had been allegations of damage to tangible property, consequential damages might be recoverable for "intangibles." As one commentator noted:

> The court did seem to indicate that *had* there been an allegation of damage to tangible property, the consequential damages might well include investments and anticipated profits.[17]

 Since Santucci now contends the damages alleged, exclusive of profits, are greater than or equal to the limits of the policy, there is no need to decide whether lost profits would be recoverable as consequential damages. Nevertheless, overhead expenses are recoverable because they are a measure of the actual physical damage occasioned by the breach. Geddes S. Smith, Inc. v. St. Paul Mercury Indem. Co., *supra,* 63 Cal. 2d 602, 47 Cal.Rptr. at 569, 407 P.2d 868.

In conclusion, the Hartford suit for declaratory judgment is not premature; the collapse hazard exclusion is inapplicable on the facts presented; damage to the casings is not covered by the policy; the underground collapse hazard provision does not cover any of the damages alleged; and the damages alleged are not intangibles and thus excluded from coverage. Therefore, the judgment of this court is that Hartford's motion for summary judgment is Granted in part and Denied in part, and Crider's and Santucci's motion for summary judgment is Granted in part and Denied in part, all in accord with findings and conclusions stated herein.

---

15. See Narko, "The 1972 Comprehensive General Liability Policy," 61 Ill.Bar J. 34–35 (1972).

16. 10 Ill.App.3d 115, 294 N.E.2d at 14.

17. Kirkland, "Recent Developments in Illinois Casualty Law," 23 DePaul L.Rev. 18, 25–26 (1973).