**ADAMS LABORATORIES, INC., Plaintiff,**

**v.**

**JACOBS ENGINEERING COMPANY and Pennwalt Corporation, Defendants.**

**No. 76 C 0191.**

United States District Court, N. D. Illinois, E. D.

Jan. 16, 1980.

Alfred H. Moses, David N. Brown, Washington, D. C., Michael L. Shakman, F. John McGinnis, Devoe, Shadur & Krupp, Chicago, Ill., Howard Blum, Max E. Greenberg, Trayman, Cantor, Reiss & Blasky, New York City, for plaintiff.

John H. Morrison, James A. Cherney, Robert J. Bates, Kirkland & Ellis, Chicago, Ill., for Pennwalt Corp.

Thomas D. Allen, Robert E. Kehoe, Jr., William E. Hartgering, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Jacobs Engineering Co.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge.

This action arises from the alleged misconduct of the defendants in the construction of a custom-built chemical plant for plaintiff Adams Laboratories. Counts I, III, and IV allege that defendants improperly induced the plaintiff to enter into the construction contract, setting forth the alternative theories of fraudulent, negligent, and innocent misrepresentation. Count II alleges negligence on the part of the defendants in the construction of the chemical plant. Counts V through IX seek damages for alleged breaches of the contract between Jacobs and Adams.

Defendant Jacobs has moved for summary judgment on two grounds. First, Jacobs asserts that there are no material issues now in dispute, and that as a matter of law it is entitled to judgment. Second, Jacobs argues that because Adams entered into an agreement to dismiss the litigation as to Pennwalt without an express reservation of its right to proceed against Jacobs, Adams has forfeited its cause of action against Jacobs.[1]

The Seventh Circuit has observed that "[w]ith the ever increasing burden upon the judiciary, persuasive reasons exist for the utilization of summary judgment procedure whenever appropriate." *Kirk v. Home Indemnity Co.*, 431 F.2d 554, 560 (7th Cir. 1970). Nonetheless, it is not within the province of the Court to resolve issues of disputed fact in a trial by affidavit. *Moutoux v. Gulling Auto Electric, Inc.*, 295 F.2d 573, 576 (7th Cir. 1961). The basic mission of the summary judgment procedure is to allow the Court to determine whether there are any factual disputes which require resolution by trial. "[The] party moving for summary judgment has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in his favor." *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 10 (7th Cir. 1979). Any doubts as to the existence of material issues of fact must be resolved against the moving party. *Moutoux*, 295 F.2d at 576. It is in light of these governing principles that the Court must assess Jacobs' motions for summary judgment.

### The Misrepresentation Claims

In Counts I, III, and IV, Adams alleges that it was induced to enter into the contractual relationship with Jacobs on the basis of Jacobs' misrepresentations as to its qualifications and expertise. Specifically, Adams alleges that Jacobs claimed to have fifty years of experience in designing the type of chemical plant desired by Adams, and that it had successfully designed several such plants at locations throughout the world. In addition, Adams asserts that Jacobs represented that a particular site was appropriate for construction of the plant and that the proposed plant would cause no environmental problems. Adams claims that these representations were false when

---

1. In response to this claim, Adams has filed a motion to strike Jacobs' Eighth Affirmative Defense, which is based on the agreement between Adams and Pennwalt. In addition, Jacobs has filed a motion to disqualify certain counsel for Adams on the ground that his testimony will be required if the issue of the agreement goes to trial.

made, and that its assent to the contract therefore was improperly induced.

■ Illinois law clearly recognizes a cause of action for misrepresentations which induce a party to enter into a contractual relationship which he otherwise would have foregone. *Eisenberg v. Goldstein*, 29 Ill.2d 617, 195 N.E.2d 184, 186, *cert. denied*, 377 U.S. 964, 84 S.Ct. 1645, 12 L.Ed.2d 735 (1964). This is the case irrespective of whether the misrepresentation is fraudulent. *Lake City Corp. v. Michigan Avenue National Bank of Chicago*, 33 Ill. App.3d 100, 337 N.E.2d 251, 255 (1st Dist. 1975). Jacobs, however, argues that Adams waived its misrepresentation claims by continuing to adhere to the contractual relationship between the parties even after it learned of the alleged misrepresentation. *Eisenberg*, 195 N.E.2d at 186–187; *Bulley & Andrews, Inc. v. Symons Corp.*, 25 Ill. App.3d 696, 323 N.E.2d 806, 811 (1st Dist. 1975).

The essential premise of this argument is that Adams learned of the alleged misrepresentations by early 1975, prior to the time at which Adams sought Jacobs' assistance in attempting to remedy the deficiencies in the chemical plant. This premise is based on the assumption that because Adams knew and complained of deficiencies in the performance of the plant, it also knew of the misrepresentations as to Jacobs' qualifications and expertise with respect to the construction of such a plant.[2] In *Eisenberg*, the plaintiffs alleged that the defendant had induced their contractual relationship by misrepresenting the condition of the building that was the subject of the contract. In that case, the court held that upon taking possession of the building and learning of the numerous building code violations, the plaintiffs should have been aware that the building was not in "first rate physical condition" as had been claimed by the defendant. *Id.*, 195 N.E.2d at 186. Similarly, in *Symons Corp.*, the defendant allegedly had induced plaintiff's agreement to a contract by misrepresenting the true cost of a particular concrete forming process. The court observed that once the plaintiff became aware of the true cost of the process, it could be charged with awareness of any alleged misrepresentation. *Id.*, 323 N.E.2d at 811.

■ *Eisenberg* and *Symons Corp.*, however, are distinguishable. In the instant case, the relationship between the alleged misrepresentation as to qualifications and the deficiencies in the plant's performance is less direct. As a result, plaintiff's dissatisfaction with the performance of the plant does not necessarily suggest awareness of the alleged misrepresentations as to Jacobs' expertise and qualifications. The Court concludes that Jacobs has failed to satisfy its burden of establishing the nonexistence of dispute as to the critical factual issue of when Adams learned of the alleged misrepresentations. Accordingly, its motion for summary judgment as to Counts I, III, and IV is denied.[3]

2. Adams disputes this characterization, claiming that it did not suspect that there had been misrepresentations as to qualifications and expertise until late 1975, and that it did not fully become aware of the misrepresentations until after this lawsuit was filed.

3. Jacobs' claim that rescission is unavailable as a remedy for the misrepresentation claims raises similar issues. In the *Matter of Peoples Marketing Corp. v. Hackman*, 347 F.2d 398, 400 (7th Cir. 1965), the court denied rescission of an agreement because the plaintiff had not demonstrated "that its actions following the discovery of such fraud, assuming arguendo there was [a] fraud, constituted rescission of the contract." As discussed above, there remains a material factual dispute as to when Adams learned of the misrepresentation.

Thus, the Court cannot resolve the rescission issue on a motion for summary judgment.

Moreover, the Court rejects Jacobs' contention that the sale of the chemical plant renders rescission of the contract impossible. It is true that a normal prerequisite of rescission is the return of the benefits conferred on the complaining party, which in this case would mean the return of the plant to Jacobs. However, Adams alleges that it offered to return the plant to Jacobs, who declined to accept. This offer is sufficient to satisfy the requirement. *Jackson v. Anderson*, 355 Ill. 550, 189 N.E. 924 (1934); *Corbett v. Devon Park*, 12 Ill.App.3d 559, 299 N.E.2d 521, 530 (1st Dist. 1973). Moreover, if the Court eventually should order rescission, Jacobs could be placed in the status quo by a return of the value of the property it

## The Negligence Claims

In Count II, Adams seeks to recover damages for Jacobs' alleged negligence in the construction of the chemical plant. According to the plaintiff, the chemical plant built by Jacobs was to convert raw soapstock into specified quantities of fatty acids, glycerin, and inorganic salts by a process called saponification and acidulation. Due to the alleged negligence in the design of the plant, however, Adams claims that inadequate amounts of fatty acids, and no glycerin or inorganic salts, were recovered. Jacobs moves for summary judgment on this claim on the grounds that tort theories of liability do not permit recovery "for solely 'economic losses' absent property damage or personal injury from the use of the product." *Alfred N. Koplin & Co. v. Chrysler Corp.*, 49 Ill.App.3d 194, 7 Ill.Dec. 113, 120, 364 N.E.2d 100, 107 (2d Dist. 1977). Adams counters that since there was damage to the raw soapstock that is used in the saponification process, it is entitled to state a claim for negligence.

■ In *Koplin*, the court defined economic loss as damages for inadequate value, repair, and replacement of the defective good, loss of profits, and diminution in the value of the product. *Id.*, 7 Ill.Dec. at 116, 364 N.E.2d at 103. Since the complaint alleged no damage to person or property, the court found that an action in tort could not lie. *Id.*, 7 Ill.Dec. at 120, 364 N.E.2d at 107. This case, however, presents a more subtle question of the dividing line between economic and property damage. The plaintiff's primary grievance in Count II concerns the plant's failure to perform up to expectations, and the resultant economic loss. However, the plaintiff also alleges

that the imperfections in the process caused damage to its property—the raw soapstock used in the saponification process. This is not diminution in the value of the product sold by Jacobs to Adams, one of the definitions of economic loss. Rather, it is diminution in the value of a separate piece of property that is used in the process. In this sense, the instant case is more analogous to *Admiral Oasis Hotel v. Home Gas Industries*, 68 Ill.App.2d 297, 216 N.E.2d 282 (1st Dist. 1965), wherein the court permitted an action in negligence for the faulty construction of an air conditioning unit when there also was damage to carpeting and furniture from the malfunctioning unit. This alleged loss is sufficient to state a claim for property damage as required to sustain a negligence count under *Koplin*.[4] Accordingly, the motion for summary judgment on Count II is denied.

## Consequential Damages

In Counts V through IX of the Amended Complaint, Adams seeks the recovery of damages stemming from the alleged breach of several provisions of the contract between the parties. Jacobs seeks a judgment in its favor on this issue of consequential damages, relying on Section 12.4 of the contract:

If Jacobs should then fail to commence proceedings in good faith expeditiously to remedy such breach within ten (10) days after delivery of such written notice, or such shorter period as Owner may reasonably specify in such notice, Owner shall then, but not otherwise, be entitled to such damages therefor as may be awarded at law or in equity, except that in no case shall Owner be entitled to contingent or consequential damages . . .

gave to Adams, rather than the property itself. *In the Matter of the Estate of Neprozatis*, 62 Ill.App.3d 563, 19 Ill.Dec. 470, 476, 378 N.E.2d 1345, 1351 (1st Dist. 1978).

4. Judge Flaum reached the same conclusion in ruling on an earlier motion by Jacobs to dismiss Count II. Jacobs, however, also argues that the discovery conducted subsequent to Judge Flaum's earlier ruling clearly establishes that in fact there was no damage to the soapstock. In support of this argument, Jacobs

relies on figures which suggest that the value of the fatty acids derived from the soapstock exceeded the value of the raw soapstock. Adams, of course, disputes these figures citing other figures to support its claim that the cost of the soapstock was greater than the value of the fatty acids produced. The Court concludes that the undocumented figures presented by Jacobs are inadequate to satisfy its burden of showing the nonexistence of material factual issues.

In opposing this motion, Adams argues that under Illinois law, a limitation on consequential damages will not be honored where the corrective action is undertaken in bad faith or is wilfully dilatory. *Jones & McKnight Corp. v. Birdsboro Corp.*, 320 F.Supp. 39 (N.D.Ill.1970); *Adams v. J. I. Case*, 125 Ill.App.2d 388, 261 N.E.2d 1 (4th Dist. 1970). In both *Jones* and *Adams*, the contractual provisions at issue limited the plaintiffs' remedies to repair or replacement. In both cases, the defendant had failed to make timely repairs. Notwithstanding the exclusion in the contract of any warranties, the courts found it appropriate to infer certain warranties for the benefit of the plaintiffs. Having done so, the courts then were faced with the question of whether consequential as well as direct damages should be available for breach of these warranties. Since the duty to repair evidently was a *quid pro quo* for the limitation on remedies, the courts considered it untenable to allow the defendants to avoid their repair obligations and still enforce the limitation on damages.

■ This instant case, however, presents a different situation. Here, the contractual provision does not limit the plaintiff's remedy to repair or replacement. Rather, in the event that the defendant failed to repair or replace, the clause expressly reserved the plaintiff's right to seek available judicial remedies—with the notable exception of consequential damages. Unlike *Jones* and *Adams*, the limitation on consequential damages involved in this case is not dependent upon the good faith exercised by the defendant with respect to its duty to repair or replace the plant. This provision makes it apparent that the parties did not contemplate that Jacobs would be liable for consequential damages, irrespective of its good faith.

■ Nor is this clause of the contract unenforceable due to the alleged fraudulent inducement of plaintiff into the contractual relationship. Fraudulent inducement would form the basis for rescinding this limitation if the fraud related directly to the plaintiff's acceptance of the provision. *Gates Rubber Company v. USM Corp.*, 508 F.2d 603, 617 (7th Cir. 1975). Such is not the case here. Thus, although the alleged fraudulent inducement might entitle plaintiff to damages irrespective of the contract, it does not empower the plaintiff to enforce certain provisions of the contract which are to its liking and excise the rest.

Thus, the Court concludes that the defendant is entitled to a judgment in its favor on the issue of consequential damages.[5] The Court, however, will not rule at this time on the issue of which damages claimed by the plaintiff are consequential. There remain factual disputes relevant to a determination of this issue which are inappropriate for summary resolution.

### The Release of Pennwalt

#### 1. Whose Law Governs

Late in January, 1979, Adams and Pennwalt entered into an agreement whereby Adams would forego its claims against Pennwalt in exchange for payment of $10,000 and certain assistance to Adams in its litigation against Jacobs. Jacobs argues that this agreement constitutes a release of Pennwalt, which under Illinois law also operates to release Jacobs from any liability it might have to Adams. Adams, on the other hand, argues that either New York or Pennsylvania law governs this issue, and that under the law of these states the agreement between Adams and Pennwalt does not release Jacobs. Alternatively, plaintiff argues that even under Illinois law the agreement does not release Jacobs.

■ The first question, then, is which state's law governs. In diversity cases a federal court is required to apply the choice of law rules of the state in which the court sits. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85

---

5. The Court, however, disagrees with Jacobs' claim that any consequential damages resulting from the negligence alleged in Count II or IV are barred as well. Counts II and IV arise from theories unrelated to the contract between the parties. Therefore, the defendant cannot rely on a contractual provision to limit its potential liability under these counts.

L.Ed. 1477 (1941). The prevailing Illinois rule is that if performance and execution of a contract occur in different states, the place of performance governs questions of validity, construction, and scope. If, however, the contract is to be performed in more than one state, the law of the place of execution governs. *P. S. & E., Inc. v. Selastomer Detroit, Inc.,* 470 F.2d 125, 127 (7th Cir. 1972); *Hartford Accident and Indemnity Co. v. Crider,* 392 F.Supp. 162, 167 (N.D. Ill.1974); *Oakes v. Chicago Fire Brick Co.,* 388 Ill. 474, 58 N.E.2d 460, 462 (1944); *Cook Associates, Inc. v. Colonial Broach & Machine Co.,* 14 Ill.App.3d 965, 304 N.E.2d 27, 31–32 (1st Dist. 1973).

In this case, it is clear that the place of execution and of performance differ. The negotiations between Pennwalt and Adams took place via telephone conversations between counsel in New York and Illinois. The document was drafted in Illinois, and signed by the representative of Adams in New York and then of Pennwalt in Pennsylvania. As for performance, it is clear that at least part of the performance occurred in Illinois when Adams filed the agreement with the court and dismissed Pennwalt from the litigation. Unfortunately, the parties have not informed the Court as to the place in which payment of the $10,000 was to be made. However, at least part of the cooperation which was part of the agreement—the interview with Albert S. Zambone—occurred in Pennsylvania.

▮ Indeed, not only do the place of execution and performance differ, but both execution and performance took place in more than one jurisdiction. In such circumstances, when the normal Illinois choice of law rule cannot function properly, it is appropriate to apply the "most significant contacts" doctrine which Illinois courts have begun to adopt in other substantive law areas. *See P. S. & E., Inc. v. Selastomer Detroit, Inc.,* 470 F.2d 125, 127 (7th Cir. 1972); *Ehrman v. Cook Electric Company,* 468 F.Supp. 98, 100 (N.D.Ill.1979).[6]

▮ Under this approach to choice of law in contract cases, the courts are to examine five factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the situs of the subject matter of the contract; and (5) the domicile, residence, place of incorporation, and place of business of the parties. RESTATEMENT (SECOND) OF CONFLICT LAWS § 188. In this case, the place of contracting—which the Restatement defines as where the last act necessary to make the document binding occurs—is Pennsylvania, where Pennwalt signed the agreement. The negotiations took place by telephone in New York and Illinois. On the facts before the Court, performance occurred in Illinois and Pennsylvania. The location of the chemical plant which is the focus of this litigation is Illinois. Finally, Adams is a Delaware corporation with its principal place of business in Virginia,[7] while Pennwalt is a Pennsylvania corporation with its principal offices in Pennsylvania.

▮ The foregoing reveals that both Illinois and Pennsylvania share a number of contacts to this litigation. Upon closer examination, however, the Court believes that an Illinois court would apply Illinois law in this case. A relevant factor in applying the most significant contacts test is the interests of the forum as well as of other states in the issue presented. In this context, it

---

6. Illinois first adopted the most significant contacts test with respect to tort cases in *Ingersoll v. Klein,* 46 Ill.2d 42, 262 N.E.2d 593 (1970). Recent decisions have adopted this approach with respect to trusts and wills issues. *Ford v. Newman,* 64 Ill.App.3d 528, 21 Ill.Dec. 283, 381 N.E.2d 392 (4th Dist. 1978); *Johnson v. LaGrange State Bank,* 50 Ill.App.3d 830, 8 Ill.Dec. 670, 365 N.E.2d 1056 (1st Dist. 1977).

7. Adams now claims, with supporting affidavit by its Chairman of the Board, that its principal place of business at the time the agreement was signed in January, 1979, was New York. However, in the Second Amended Pretrial Order, which was signed by the parties in March, 1979, Adams listed its sole office as located in Fairfax, Virginia. Thus, without more compelling evidence from Adams, the Court cannot conclude that Adams in fact does conduct business in New York. The Court observes, however, that this point has no bearing on its conclusion as to the applicable law in this case.

must be remembered that the issue in question is not the scope or validity of the agreement vis-a-vis Adams and Pennwalt, but rather, the scope of the agreement with respect to Jacobs. As to this latter question, Pennsylvania has no perceptible interest. On the other hand, Illinois does have an interest by virtue of the fact that Jacobs, a California corporation, maintains a place of business in Illinois. As a result, Illinois has a decided interest in whether the agreement is to operate as a release of any liability on the part of Jacobs. Accordingly, the Court will apply Illinois law in determining the scope of the release with respect to Jacobs.

### 2. Effect of the Agreement on Adams' Cause of Action Against Jacobs

■ Under Illinois law, a release completely extinguishes a cause of action. A covenant not to sue, on the other hand, affects only the right to bring an existing cause of action against a particular party. *Pate v. City of Sesser,* 75 Ill.App.3d 233, 30 Ill.Dec. 799, 802, 393 N.E.2d 1146, 1149 (5th Dist. 1979). Seizing upon this distinction, Jacobs argues that the agreement between Pennwalt and Adams was a release, thereby eliminating any cause of action Adams has against it. Adams, for its part, does not expressly argue that the agreement was a covenant not to sue. Rather, it emphasizes that the intent of the parties was that the agreement would release only Pennwalt from liability.[8] Nevertheless, the determinative question upon which the Court must focus is whether Illinois law would treat the agreement between Pennwalt and Adams as a release or as a covenant not to sue.

■ In Illinois, the intent of the parties is controlling in determining whether an agreement is to be treated as a release or as a covenant not to sue. *Pate,* 30 Ill.Dec. at 803, 393 N.E.2d at 1150; *Mitchell v. Weiger,*

56 Ill.App.3d 236, 13 Ill.Dec. 796, 798–799, 371 N.E.2d 888, 890–891 (1st Dist. 1977); *Gladinus v. Laughlin,* 51 Ill.App.3d 694, 9 Ill.Dec. 173, 175, 366 N.E.2d 430, 432 (5th Dist. 1977); *Parmelee v. Lawrence,* 44 Ill. 405, 413 (1867). Thus, while Illinois has retained the distinction between releases and covenants not to sue, it has mitigated the often-times harsh results engendered by that distinction by focusing on the interest of the parties rather than on the strict language of the agreement. This can be seen in a number of recent Illinois decisions which have construed agreements to be covenants not to sue despite language more appropriate to a release. *Pate,* 30 Ill.Dec. at 803–804, 393 N.E.2d at 1150–1151 (agreement purporting to "release . . . and forever discharge" a party construed as a covenant not to sue); *Mitchell,* 13 Ill.Dec. at 800, 371 N.E.2d at 892 (document entitled "Release" which contained language purporting to "release and forever discharge" a party construed as a covenant not to sue).

These decisions, rather treating the word "release" as a talismanic device for distinguishing between releases and covenants not to sue, have examined three factors in determining the intent of the parties. First, they consider whether the language of the agreement addresses persons other than parties to the agreement. Second, they determine whether the document expresses an intent to retain a right of action against persons not parties to the agreement. Finally, the courts consider whether the payment which is part of the agreement is sufficient to compensate the plaintiff for the whole injury he allegedly suffered. *Pate,* 30 Ill.Dec. at 804, 393 N.E.2d at 1151; *Mitchell,* 13 Ill.Dec. at 800, 371 N.E.2d at 892.

■ Applying these factors to the instant case, the Court concludes that the

---

8. A release would extinguish Jacobs' liability only if it and Pennwalt were joint obligors to Adams. Adams asserts with some force that Jacobs and Pennwalt were not joint obligors, and that its release of Pennwalt therefore has no impact on its action against Jacobs. For the purposes of the following discussion, the Court will assume that Pennwalt and Jacobs in fact were joint obligors. Because of the resolution of the issue concerning the Pennwalt-Adams agreement, it is unnecessary for the Court to delve into the merits of the joint obligor question.

agreement between Adams and Pennwalt must be construed as a covenant not to sue rather than a release. First, the language of the agreement makes it clear that only Pennwalt and Adams were parties to the accord. Second, implicit in the agreement is an intent by Adams to retain its right of action against Jacobs. In Paragraph 3 of the agreement, Adams promised to reimburse Pennwalt, up to the sum of $10,000, for any judgment by Jacobs against Pennwalt on "any claim or cross-claim for contribution." This clearly contemplates that Adams would proceed with the litigation against Jacobs; otherwise, Jacobs would not be in a position to seek contribution against Pennwalt. In addition, Paragraph 4 outlines the circumstances in which employees of Pennwalt could appear or testify "at the trial of this action." It further requires Pennwalt to report to Adams of any attempt by "Jacobs to compel the appearance and testimony at trial of any employee of Pennwalt." Again, this clearly indicates that Adams intended to go forth with its litigation against Jacobs. Finally, Paragraph 5 required that Pennwalt make available Albert S. Zambone for a three hour interview "relating to the subject matter of this litigation." Adams certainly would have no interest in such information unless it intended to pursue its available judicial remedies against Jacobs. Third, it is apparent that Adams did not consider the $10,000 payment by Pennwalt to be full compensation for its alleged injuries, since Adams in this litigation seeks $5.5 million in compensatory and punitive damages. *See Pate,* 30 Ill.Dec. at 804, 393 N.E.2d at 1151 ($10,000 payment not considered full satisfaction where claim was in excess of $20,000).

Notwithstanding the foregoing indicia of intent, Jacobs argues that the agreement must be construed as a release for two reasons. First, Jacobs asserts that since Adams consistently has referred to the agreement as a release, the Court must treat it as such. As indicated above, this factor is relevant only insofar as it provides insight into the intent of the parties; it is not in itself determinative of that intent. Thus, in light of the strong indication of intent to retain the right of action against Jacobs implicit in the agreement, the fact that Adams used the word "release" to describe the accord does not require a contrary result.

Second, Jacobs argues that the determination of intent should be controlled by the fact that the agreement contains no express reservation of Adams' right to proceed against Jacobs. Jacobs is correct when it states that there is no reported Illinois decision which has construed an agreement as a covenant not to sue in the absence of an express reservation. However, if the intent of the parties is the critical inquiry, the Court sees no reason why that intent may not be found in the implicit, rather than explicit, language of a document. In this case, it is clear that Adams intended to preserve its right of action against Jacobs. To hold that this intent must be ignored because it is implicit would be to return to the rigid formalism that the more recent Illinois decisions have sought to avoid. Therefore, the Court will follow the lead of recent Illinois decisions by honoring the intent of Adams to preserve its right of action against Jacobs.

In summary, the Court denies Jacobs' motion for summary judgment as to Counts I through IV of the Amended Complaint. As to Counts V through IX, the Court will grant Jacobs' motion for summary judgment as to consequential damages, reserving the question of which damages fall within that category. With respect to the motions relating to the agreement between Adams and Pennwalt, Jacobs' motion for summary judgment will be denied and Adams' motion to strike will be granted. Accordingly, Jacobs' eighth affirmative defense will be stricken.[9] It is so ordered.

---

9. Since the issue of the Pennwalt-Adams agreement will not be raised at trial, there no longer is the possibility that Adams' counsel will be called to testify on that issue. As a result, the Court need not address the defendant's motion to disqualify Adams' counsel.