BOISE CASCADE HOME & LAND CORP., Plaintiff and Counterdefendant-Appellee, *v.* UTILITIES, INC., Defendant and Counterplaintiff-Appellant.

First District (1st Division)   No. 83—1035

Opinion filed August 20, 1984.

Paul W. Schroeder, Pamela B. Strobel, and Clay A. Tillack, all of Isham, Lincoln & Beale, of Chicago, for appellant.

Francis J. Higgins and Carol Childs, both of Bell, Boyd & Lloyd, of Chicago, for appellee.

JUSTICE McGLOON delivered the opinion of the court:

This appeal arises from a contract action filed by Boise Cascade Home & Land Corp. and a counterclaim for breach of contract filed by

Utilities, Inc. Utilities, Inc., appealed from a judgment entered on directed verdicts in favor of Boise on both claims. On appeal, Utilities contends (1) the trial court's finding that the contract was unambiguous and its construction of the contract were erroneous; (2) a question of fact in Utilities' counterclaim precluded the entry of a directed verdict; (3) the trial court erred in directing a verdict on Boise's claim against Utilities; and (4) the trial court erred in awarding prejudgment interest on Boise's claim at Indiana's statutory rate.

We affirm in part, reverse in part and remand.

The actions from which this appeal arises were based on a contract for the sale of Twin Lakes Utilities, Inc. (Twin Lakes), an Indiana corporation. In 1961, a predecessor and subsidiary of plaintiff-counterdefendant Boise Cascade Home & Land Corp. (Boise) was engaged in planning and developing a project in Indiana known as Lakes of the Four Seasons Development. Twin Lakes had been incorporated to provide water supply and sewage treatment and disposal facilities for the development. In 1968, defendant counterplaintiff Utilities, Inc. (Utilities), purchased Twin Lakes from Boise.

In 1977, Boise filed an action against Utilities seeking, *inter alia*, payment of fees allegedly due under the purchase agreement. The contract provided that Utilities was to pay Boise $250 for each connection to the utility system commencing with the 101st customer and ending with the 500th customer and $200 for each connection commencing with the 501st customer and ending with the 1500th customer. In addition to an answer, Utilities filed a counterclaim in which it alleged that Boise breached article III, paragraph 3, of the sales agreement. This section provides in pertinent part:

> "As an additional inducement to Purchaser to enter into this agreement, Seller agrees \*\*\* to construct and install, or to cause to be constructed and installed, without cost or expense to Utility or to Purchaser all sanitary sewage collection facilities portrayed by the plans therefor \*\*\* heretofore delivered to Purchaser, along with all facilities and equipment incident thereto and reasonably required to provide complete and adequate sewerage service to lot purchasers in the Development."

Utilities specifically alleged that the sewage system lacked sufficient main capacity to serve all lot purchasers in the Lakes of the Four Seasons Development and that new mains had to be installed at a cost in excess of $200,000.

The actions were consolidated with another not involved in this appeal, and Utilities proceeded first in presenting its evidence at trial. Utilities called as witnesses David Owens, its executive vice-president,

and Joseph Rezek, an engineering expert in the design and construction of sewer systems.

Owens identified the sales contract and testified that the certificate of territorial authority referred to therein was a certificate issued by the Indiana Public Service Commission authorizing the utility to provide water and sewer service in a particular area. Boise had applied for the certificate and defined the area to be serviced. In May 1979, an area north of the northeast section of Lakes of the Four Seasons known as T-Bone Lake was added to the certificated area. An agreement dated May 25, 1966, entered into by Twin Lakes and Mid-America Homes, Incorporated, the developer of T-Bone Lake subdivision, required Twin Lakes to apply for the certificate of territorial authority when Mid-America chose to develop the area. Under its contract with Boise, Utilities was obligated to honor the agreement between Twin Lakes and Mid-America.

Owens further testified that when Utilities purchased Twin Lakes, only about half of the sewage system had been installed. Boise agreed to pay for and install the remainder of the system. Utilities received design plans of the water supply and sewage disposal and treatment facilities.

According to Owens, the sewer system in the Development was neither designed nor built correctly. As a result, the capacity was inadequate and maintenance was difficult. Owens explained that the system operated on principles of gravity and the slope and diameter of the mains determined the system's capacity. The system would have functioned properly if the existing mains had been installed at a steeper angle or if larger mains had been used. Owens calculated the projected peak sewage flows for the single-family lots, the 14 major multifamily and commercial lots within the originally certificated area, and the T-Bone Lake subdivision. Owens concluded that the existing sewer system would not be able to accommodate the sewage flow from these areas when each was fully developed. Utilities had considered using the existing system to its maximum capacity and adding new trunk lines to handle excess sewage.

On cross-examination, Owens admitted that the majority of the T-Bone Lake Subdivision was not part of the certificated area when Utilities purchased Twin Lakes. He also stated that his conclusion on the inadequacy of the system depends on the inclusion of T-Bone Lake and the commercial tracts in the Lakes of the Four Seasons. The system would be adequate to service single-family lots in the Lakes of the Four Seasons. Owens further testified that the inadequacy would not become apparent for several more years, when all of the property used

in his calculations was fully developed. Prior to purchasing Twin Lakes, Utilities inspected the existing sewage treatment plant, lift stations, pumps, wells, and sewer and water mains and found the facilities acceptable. The plans for the sewer system were delivered prior to closing and had been examined by Utilities and approved by the State of Indiana.

On redirect, Owens testified that in a few instances, Utilities found mains running in the wrong direction or missing. He assumed that the agreement between Boise and Mid-America obligated Boise to install mains in the originally certificated area which would have the capacity to service T-Bone Lake when such service was requested.

Joseph Rezek testified that during the summer of 1979 his engineering firm was retained by Utilities to design a sewage treatment plant expansion in Lakes of the Four Seasons. Utilities had requested Rezek's services because areas within and outside of the originally certificated area were under development and required sewer facilities. Rezek reviewed the plans of the existing sewer facilities and conducted a field survey in Lakes of the Four Seasons and T-Bone Lake to determine the capacity of the system. He explained that sewer systems are generally designed for 40 to 50 years of service and testified that under this standard, the system installed at Lakes of the Four Seasons was inadequate. Rezek proposed that Utilities install additional mains to transport sewage from T-Bone Lake to the sewage treatment plant in Lakes of the Four Seasons.

On cross-examination, Rezek testified that some sewer mains had already been installed to collect sewage from T-Bone Lake Development. Under his proposal, T-Bone Lake would be serviced by a separate system. His analysis of the system's capacity included areas other than single-family lots in Lakes of the Four Seasons, and he could only estimate what facilities would not be needed if T-Bone Lake was not included in an analysis of the capacity of the system. At the time of trial, the sewer system was serving single-family lots adequately; however, other lot owners had not yet built residences.

At the close of Utilities' case, Boise moved for directed verdicts on Utilities' counterclaim and on its action for payment of connection fees due under the contract. In support of its claim, Boise presented a stipulation entered into by the parties stating the amount due under the formula specified in the contract. The trial court granted Boise's motions, entered judgment against Utilities in both actions, and ordered Utilities to pay $230,250. Boise's motion for prejudgment interest at Indiana's statutory rate of 8% was also granted.

On appeal, Utilities first contends the trial court erred in directing

a verdict in favor of Boise on Utilities' counterclaim for breach of contract. It argues that contract ambiguities and questions of fact as to the adequacy of the sewer system precluded the entry of a directed verdict.

Regarding the issue of contract interpretation, Utilities contends the trial court erred in restricting the definition of the term "lot purchasers in the Development" to purchasers of single-family lots in the Lakes of the Four Seasons Development. Utilities contends the phrase is ambiguous and could reasonably be construed to include tracts and parcels on which commercial establishments, schools, clubhouses and multiple family dwellings were built. Also, Utilities argues that under the terms of the contract, Boise was required to provide a sewer system which would adequately service the T-Bone Lake subdivision if and when Mid-America requested sewer service for that area.

■■■ A contract is ambiguous if it is reasonably susceptible to being understood in more than one sense or is obscure in meaning. (*Joseph v. Lake Michigan Mortgage Co.* (1982), 106 Ill. App. 3d 988, 436 N.E.2d 663.) Whether an ambiguity exists is a question of law to be determined by the court. (*Joseph v. Lake Michigan Mortgage Co.* (1982), 106 Ill. App. 3d 988, 436 N.E.2d 663; *Pioneer Trust & Savings Bank v. Lucky Stores, Inc.* (1980), 91 Ill. App. 3d 573, 414 N.E.2d 1152.) Where no ambiguity is present, the meaning of the agreement and the intent of the parties must be ascertained from the language of the contract. *Touhy v. Twentieth Century-Fox Film Corp.* (1979), 69 Ill. App. 3d 508, 387 N.E.2d 862.

■ After reviewing the contract and construing the provisions as a whole, we find no error in the trial court's finding that the phrase "lot purchasers in the Development" means single-family lots within the Lakes of the Four Seasons Development. The first paragraph of the agreement indicates the term "Development" means the Lakes of the Four Seasons Development. Additionally, various terms are used throughout the contract to describe sections of realty within the development. In addition to the specific reference to lot purchasers in the clause in issue, the agreement stated that Boise had not permitted lot purchasers to acquire any interest in the system. Distinctions between lots and other divisions of realty within the development were made in article IV, paragraph 7 and article III, paragraph 1. In these paragraphs, Boise represented that it was retaining a large investment in other property in the development and that it had a large inventory of lots for sale. Boise excluded from the transfer lines and facilities located upon lots or tracts held by it for investment or sale. Also, in article I, paragraph 7, the parties used the terms "units" and "subdivi-

sions" to describe the areas in which Boise had installed and was in the process of extending sewage collection mains. As noted by the trial court, the contract indicates that the Lakes of the Four Seasons Development was divided into different areas and that the parties deliberately used the words lots, units, subdivisions or development to specifically identify the areas to which they intended to refer. In reaching its conclusion, the trial court followed the well-established rules that a contract must be construed to give meaning to each term and that words are inserted purposefully and deliberately to indicate the parties' intent. *State Farm Mutual Automobile Insurance Co. v. Schmitt* (1981), 94 Ill. App. 3d 1062, 419 N.E.2d 601; *Pierce v. MacNeal Memorial Hospital Association* (1977), 46 Ill. App. 3d 42, 360 N.E.2d 551.

Furthermore, we do not agree with Utilities' contention that the sewer system was intended to service the T-Bone Lake area. Article I, paragraph 4, of the purchase agreement provides:

"There are no contracts or obligations of any nature between Utility and any other party except an Agreement for Construction and Indemnity dated March 1, 1966, between Utility and United States Land, Inc. and an agreement made under date of May 25, 1966, between Seller and Mid-America Homes, Inc., and assumed by Utility under date of September 17, 1966, copies of which agreements have been delivered to Purchaser."

This section contains no representations as to the sewer system's capacity to serve Mid-America's T-Bone Lake area, nor did Boise undertake the obligation to provide a system which would accommodate T-Bone Lake's sewage flow. Rather, the parties merely acknowledged the existence of the agreement and the assumption of it by Utilities. We have found no other contract provision supporting Utilities' contention that Boise agreed to provide a sewer system which would adequately service T-Bone Lake.

Utilities also argues that even if the term "lot purchasers in the Development" is restricted to single-family lots within the Lakes of the Four Seasons Development, the evidence presented at trial presented a question of fact as to the adequacy of the sewer system which should have been decided by the jury. Utilities particularly stresses the evidence that some mains were not installed properly and according to the plans submitted by Boise. For the following reasons, we find no merit to Utilities' argument.

An integral part of Utilities' proof was the sewer system's incapacity to service T-Bone Lake subdivision and areas other than single-family lots in the Lakes of the Four Seasons Development. However, Boise's promise of adequacy did not extend to these areas. Furthermore,

Utilities represented in the agreement that it was satisfied with the physical condition and location of the facilities which Boise had installed before the contract was executed. However, there is no evidence presented to show whether design inadequacies were within the approved area or in the area constructed after the agreement was signed. Most importantly, Owens admitted that the system had been and was, at the time of trial, adequately servicing the customers in Lakes of the Four Seasons. Neither Owens nor Rezek could anticipate with much certainty when, if ever, the sewer system would become inadequate to serve the area specified in the contract.

In summary, we find that the trial court properly granted Boise's motion for a directed verdict on Utilities' counterclaim for breach of contract. The evidence, when viewed in its aspect most favorable to Utilities, so overwhelmingly favored Boise that no contrary verdict could stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

Third, Utilities contends the trial court erred in directing a verdict on Boise's action for payment of connection fees. It argues that the stipulation upon which the directed verdict was based was merely a stipulation as to damages and did not relieve Boise of its burden of proving performance of its obligations under the contract by a preponderance of the evidence.

The pertinent provisions of the stipulation provide:

"7. Taking into account all payments made, which include $100,000 down plus the $69,750 paid through July 31, 1975, the principal sum Utilities owes to BCH&L under the Purchase Agreement (aside from any alleged counterclaim, set-off, breach of contract or failure of condition) is $320,250 [*sic*] ($400,000 minus $169,750).

8. This Stipulation does not constitute a waiver of any contention, either factual or legal, of either Utilities or Boise, except as set forth herein."

In construing a stipulation, the main objective is to determine the intent of the parties (*ITT Abrasive Products Co. v. Lewis* (1973), 12 Ill. App. 3d 83, 298 N.E.2d 242), and the words therein must be given their natural and ordinary meaning. (*Laff v. John O. Butler Co.* (1978), 64 Ill. App. 3d 603, 381 N.E.2d 423.) Applying these principles to the case at bar, we find Utilities' contention to be without merit. The stipulation clearly states that Utilities owed Boise the unpaid connection fees due under the agreement, and the obligation to pay was not conditioned on proof by Boise of substantial compliance with the contract. Other provisions do not restrict the scope of the

stipulation only to the damages claimed by Boise. In fact, the only matters excluded by the stipulation were those raised in Utilities' counterclaim for breach of contract wherein it sought damages as a set-off. The intent of the parties was that the stipulation was not to affect Utilities' right to pursue its counterclaim.

■ The final issue raised by Utilities is whether the trial court erred in applying the significant contacts test in awarding prejudgment interest at the Indiana statutory rate of 8%. Utilities does not contest the assessment of prejudgment interest, but argues that Illinois has not recognized the significant contacts test in contract actions and that under traditional conflict of laws principles, Illinois law should have been applied. Utilities further argues that even if the significant contacts test is applicable, the trial court's finding that Indiana had the most significant relation to the action was erroneous.

Under traditional Illinois conflict-of-laws principles, the law of the place where the contract is performed and executed is applicable in determining the validity, construction and obligations of the contract. Where performance and execution occur in different States, the law of the place of performance governs. Where a contract is to be performed in more than one State, the law of place of execution is controlling. (*Oakes v. Chicago Fire Brick Co.* (1944), 388 Ill. 474, 58 N.E.2d 460.) Federal courts applying Illinois law have followed the traditional test, but have noted a trend in Illinois of adopting the most-significant-contacts test in conflict of laws cases. (*Overseas Development Disc Corp. v. Sangamo Construction Co.* (7th Cir. 1982), 686 F.2d 498, 510-11 n.43; *Zlotnick v. MacArthur* (N.D. Ill. 1982), 550 F. Supp. 371, 373 n.2; *Adams Laboratories, Inc. v. Jacobs Engineering Co.* (N.D. Ill. 1980), 486 F. Supp. 383, 389 n.6.) However, the courts in each of the aforementioned cases were required to resort to the most-significant-contacts test because the contracts in issue were performed and executed in more than one State.

In *Champagnie v. W.E. O'Neil Construction Co.* (1979), 77 Ill. App. 3d 136, 395 N.E.2d 990, this district applied the most-significant-contacts test in deciding that Illinois law was applicable in an action challenging the validity of an indemnity contract. Under the traditional test, Wisconsin law would have governed because performance was to take place there. In holding that the most significant contacts test was appropriate, the court reasoned that since *Ingersoll v. Klein* (1970), 46 Ill. 2d 42, 262 N.E.2d 593, wherein the court adopted the significant-contacts test in multistate tort actions, the application of the test had not been restricted to tort cases. *Champagnie v. W.E. O'Neil Construction Co.* (1979), 77 Ill. App. 3d 136, 144, 395 N.E.2d 996.

In the case at bar, either of the aforementioned analyses would lead to the same result. Under the traditional test still employed by the Federal courts, the significant-contacts test would be applicable because performance was to take place in both Indiana and Illinois, and the record does not contain conclusive evidence of the place of execution. *Champagnie* clearly requires analysis under the significant-contacts test. We further note that had the facts of this case been different, we would have followed *Champagnie*, and we believe that the most-significant-contacts test should be followed in conflict of laws cases involving contracts.

■ The factors to be considered in determining the State which has the most significant relationship are the place of contracting, negotiating and performance, the location of the subject matter of the contract, and the domicile, residence, place of incorporation and business of the parties. (*Champagnie v. W.E. O'Neil Construction Co.* (1979), 77 Ill. App. 3d 136, 145, 395 N.E.2d 990, 996; *McIntosh v. Magna Systems, Inc.* (N.D. Ill. 1982), 539 F. Supp. 1185, 1188.) These factors are to be evaluated in light of the relevant policies of the forum and other interested States and those States' interest in the issue. *Champagnie v. W.E. O'Neil Construction Co.* (1979), 77 Ill. App. 3d 136, 145, 395 N.E.2d 996.

■ As noted above, the contract was to be performed in Illinois and Indiana. Negotiation appears to have occurred in both States, and the place of execution is uncertain. Boise and Utilities are Delaware corporations with principal places of business in Palo Alto, California, and Northbrook, Illinois, respectively. The subject matter of the contract is located in Indiana. The foregoing reveals that both Illinois and Indiana have contacts to the litigation. However, the Illinois interest is greater than that of Indiana because enforcement of the contract was sought in Illinois and the interest was awarded on a judgment for damages rendered under Illinois law. We therefore find that prejudgment interest should have been assessed at the Illinois statutory rate.

For the foregoing reasons, we affirm the judgments entered in favor of Boise on Boise's action for connection fees and on Utilities' counterclaim. We reverse that part of the judgment awarding prejudgment interest and remand for computation of prejudgment interest at the Illinois statutory rate.

Judgments affirmed in part, reversed in part; cause remanded.

BUCKLEY, P.J., and GOLDBERG, J., concur.