STATE SECURITY INSURANCE
COMPANY, Plaintiff,

v.

FRANK B. HALL & CO., INC., et
al., Defendants.

No. 81 C 4167.

United States District Court,
N.D. Illinois, E.D.

Dec. 13, 1985.

See also, D.C., 95 F.R.D. 496.

Leonard M. Ring & Associates, Chicago, Ill., for plaintiff.

James A. Vroman, Winston & Strawn, Chicago, Ill., for defendants.

### MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

State Security Insurance Company ("State Security") charges Frank B. Hall & Co., Inc. ("Hall") and Frank B. Hall & Co. of Texas, Inc. ("Hall of Texas") (for convenience, Hall and Hall of Texas are referred to collectively as "Halls") with breach of an agency agreement between State Security and Hall of Texas. Under that agreement Hall of Texas was to obtain and administer certain lines of liability and casualty insurance to be written by State Security.

In conjunction with the parties' final pretrial order ("FPTO") designed to ready the case for trial, Halls have moved in limine for alternative relief:

1. admitting, as part of the trial evidence, State Security's receipt of proceeds from reinsurance of the claims on which it sues here, or

2. placing a constructive trust on any damages awarded to State Security, to the extent necessary for the benefit of its reinsurance carriers.

For the reasons stated in this memorandum opinion and order, this Court cannot now resolve that motion. Instead the parties are ordered to speak to serious (and possibly even jurisdictional) issues they have not previously addressed.

#### Facts[1]

During a two-and-one-half year period in the mid 1970s, Hall of Texas acted under a Surplus Lines General Agency Agreement to place State Security insurance policies covering amusement, carnival and related liability and casualty insurance with various insureds. This Court has now been apprised that State Security followed the

---

**1.** There is no disagreement between the parties as to the skeletal facts on which the current motion hinges.

familiar industry practice of spreading its risk by entering into two reinsurance treaties.[2] Under those treaties State Security would typically pay only the first $50,000 of an allowed claim, with the reinsurance carriers paying any amount of the claim in excess of $50,000.

State Security charges Halls with having misrepresented the claims history of some of the insureds and having altered the coverage of some of the State Security policies.[3] Halls have now placed at issue whether State Security should be able to collect from Halls for amounts it has already received from its reinsurance carriers. But the very presence of reinsurance has posed problems the litigants have not identified.

### *Reinsurance: "Collateral Source"?*

State Security's counsel in this action, a well-known plaintiffs' personal injury lawyer, invokes the "collateral source" rule so familiar in that branch of the torts practice. Each litigant's memorandum refers to the same general statement of the rule in its usual context, as exemplified in *Bireline v. Espenscheid,* 15 Ill.App.3d 368, 370, 304 N.E.2d 508, 510 (3d Dist.1973):[4]

> It is the rule of damages that benefits received by the plaintiff from a source wholly independent of and collateral to the wrongdoer will not diminish the damages otherwise recoverable. 22 Am. Jr.2d, Damages, Sec. 206.

In a sense any answer to the collateral source question in the typical personal injury case can be viewed as a kind of windfall. To a plaintiff the money from the collateral source, plus the receipt of undiminished damages from the tortfeasor defendant, represents a double recovery. Conversely, to allow a defendant to reduce his or her damages liability by the amount plaintiff has already received from the collateral source would mean the tortfeasor has escaped paying for all the harm caused by his or her wrong. Courts have consistently resolved that dilemma by awarding the benefit of the collateral source proceeds to the plaintiff, who has paid for them in one way or another,[5] and denying that benefit to the defendant, who has not.

Reinsurance in the present context does have a partial parallel to the classic personal injury model. If Halls are found to have breached their contract obligations to State Security, any reduction of State Security's recovery in this case to the extent of its already-realized reinsurance recoveries would pro tanto relieve Halls of responsibility for the losses their contract breach occasioned.

But the parallel breaks down when the situations of the personal injury plaintiff and of State Security are contrasted. As for the former, his or her main business activity is not that of intentionally taking the risks that eventuated in his or her injury. And in the same vein, his or her obtaining of the collateral source coverage has not been a deliberate effort to hedge

---

**2.** Though the parties to this litigation obviously knew of the reinsurance arrangements, only the current motion informed this Court of the situation.

**3.** Halls staunchly deny both the charged conduct and any damages suffered by State Security.

**4.** At the pretrial conference held to review the FPTO, this Court directed the litigants to file memoranda (1) addressing the choice-of-law question in this diversity action and (2) presenting any other motions in limine. Both sides have subsequently agreed Illinois substantive law provides the rules of decision, for the Illinois conflict-of-laws rule as to a contract to be performed in more than one state looks to the place of the contract's execution (in this case

Chicago). *Boise Cascade Home & Land Corp. v. Utilities, Inc.,* 127 Ill.App.3d 4, 12, 82 Ill.Dec. 180, 186, 468 N.E.2d 442, 448 (1st Dist.1984).

**5.** Where the collateral source consists of insurance proceeds (the most frequent case), the plaintiff's cost of providing them has been direct: payment of the insurance premiums. Where the collateral source represents (say) workers' compensation benefits, plaintiff's cost of providing them is less direct (though no less real in the economist's sense). But in the latter case, the social goal that underlies the provision of workers' compensation would surely be subverted by giving those benefits to the tortfeasor rather than to the injured employee.

such business-incurred risks. But State Security is itself in the insurance business—it deliberately contracts (for a price) to take the risks of contingencies represented by its issuance of insurance policies to others. And its entry into reinsurance contracts is an integral aspect of its insurance business, representing a partial laying off of the policy risks as a calculated form of risk minimization.

Another perspective on the contrasting situations similarly leads to the appropriateness of a difference in their treatment. When the personal injury plaintiff has previously obtained (for example) insurance coverage, the event he or she has insured against is injury by another party—the then-unknown person who turns out to be the tortfeasor in the future. Plaintiff's later suit against that tortfeasor is occasioned by that selfsame contingency having occurred, so the collateral source and the tort litigation are hooked up directly. But the contingency against which the reinsurance contracts were entered into in this case was a very different one: the occurrence of an event creating a claim for the insured under one or more of State Security's policies. And this lawsuit was triggered *not* by the occurrence of that contingency as such, but rather by Halls's asserted breach of the agency contract.

Both those lines of analysis highlight the oversimplistic nature of State Security's proposed incorporation of the "collateral source" concept into this new environment, in an effort to permit double recovery by State Security. And relatedly, one important reason for rejecting State Security's notion is to prevent any risk to Halls that the reinsurers (whether on a real-party-in-interest . notion, a third-party-beneficiary theory or otherwise) may lay claim for damages *they* have sustained because of Halls's same claimed contract breaches.

All this, however, pales beside the question immediately raised by the very existence of State Security's reinsurers: the identity of the proper parties plaintiff in this litigation. Fed.R.Civ.P. ("Rule") 17(a) mandates:

> Every action shall be prosecuted in the name of the real party in interest.

In that regard this Court defined the relationship between State Security and its reinsurers in *Cada v. Costa Line, Inc.*, 93 F.R.D. 95, 101 (N.D.Ill.1981):

> Any insurer that has made payment to its insured is subrogated pro tanto to its insured's claim—simply a fancy legalism for standing in its insured's shoes.

Our Court of Appeals has said of just such a partial subrogation situation (albeit in the context of federal-party litigation), *Wadsworth v. United States Postal Service*, 511 F.2d 64, 65 (7th Cir.1975):

> Following the Illinois practice, which permits bringing the action solely in the name of the insured when he still retains an interest in the claim because of the deductibility clause (*Brosam v. Employer's Mutual Casualty Co.*, 61 Ill.App.2d 183, 209 N.E.2d 350, 352 (4th Dist.1965)), the attorney who filed the action failed to include the insurer as a party plaintiff. In so doing the attorney overlooked the federal real-party-in-interest rule, Rule 17(a), Fed.R.Civ.P., under which the insurer who has paid part of the loss is required to be joined as plaintiff.

For the latter proposition *Wadsworth* relied on *United States v. Aetna Casualty & Surety Co.*, 338 U.S. 366, 380–81, 70 S.Ct. 207, 215, 94 L.Ed. 171 (1949) (citations omitted), which put the matter this way (again the United States was a party litigant):

> Rule 17(a) of the Federal Rules of Civil Procedure, which were specifically made applicable to Tort Claims litigation, provides that "Every action shall be prosecuted in the name of the real party in interest," and of course an insurer-subrogee, who has substantive equitable rights, qualifies as such. If the subrogee has paid an entire loss suffered by the insured, it is the only real party in interest and must sue in its own name. 3 Moore, Federal Practice (2d ed.) p. 1339. If it has paid only part of the loss, both the insured and insurer (and other insurers, if any, who have also paid portions of the loss) have substantive rights

against the tortfeasor which qualify them as real parties in interest.

In cases of partial subrogation the question arises whether suit may be brought by the insurer alone, whether suit must be brought in the name of the insured for his own use and for the use of the insurance company, or whether all parties in interest must join in the action. Under the common-law practice rights acquired by subrogation could be enforced in an action at law only in the name of the insured to the insurer's use, ... as was also true of suits on assignments,.... Mr. Justice Stone characterized this rule as "a vestige of the common law's reluctance to admit that a chose in action may be assigned, [which] is today but a formality which has been widely abolished by legislation." ... Under the Federal Rules, the "use" practice is obviously unnecessary, as has long been true in equity, ... and admiralty,.... Rule 17(a) was taken almost verbatim from Equity Rule 37. No reason appears why such a practice should now be required in cases of partial subrogation, since both insured and insurer "own" portions of the substantive rights and should appear in the litigation in their own names.

Though both *Wadsworth* and *Aetna* dealt with federal-question litigation, there is also reasoned authority that indicates Rule 17(a) controls diversity cases between private litigants as well—requiring the joinder of reinsurers in such cases too. *Travelers Insurance Co. v. Riggs*, 671 F.2d 810, 814 (4th Cir.1982). Under the analysis in *Travelers*, the subrogation provisions of Ill. Rev.Stat. ch. 110, ¶ 2–403(c) and (d) would not alter that result.[6] And with more than one reinsurer as a partial subrogee, the very risk of multiple litigation that informed the *Aetna* rule is present here. See *Garcia v. Hall*, 624 F.2d 150, 152 & n.

5 (10th Cir.1980). Accordingly the parties are ordered on or before December 27, 1985 to file supplemental memoranda:

1. disclosing the identity, state of incorporation and principal place of business of each of State Security's reinsurers (to disclose whether, if joined, they would destroy complete diversity); and

2. discussing whether joinder of the reinsurers is required under Rule 17(a) or, even if not required, should be ordered by this Court.

If the answer to the last question proves to be "no," this Court will in any event—for the reasons discussed earlier—require that State Security stand as the surrogate for its reinsurers via the vehicle of a constructive trust. In that respect *Glacier General Assurance Co. v. G. Gordon Symons Co.*, 631 F.2d 131, 134 (9th Cir. 1980) is persuasive:

Disposition of this action in the absence of the reinsurers will not impair or impede their ability to protect their interests because Glacier's recovery is impressed with a trust for the reinsurers in the amounts they are entitled to receive by principles of subrogation. 3A Moore's Federal Practice ¶ 17.09[2.–1], at 17–107 to –108 (2d ed. 1979); *see, e.g., Braniff Airways v. Falkingham*, 20 F.R.D. 141, 144–45 (D.Minn.1957). Finally, Symons and Canadian are protected from future actions by the reinsurers. *See Virginia Electric*, 485 F.2d at 85 & n. 15. Where, as here, a plaintiff brings a suit for an entire claim even though the plaintiff's insurance company has partially reimbursed the loss, the insurance company is not a necessary party.[7]

---

**6.** In literal terms that statute would also compel joinder of the reinsurer, but Illinois case law has not so applied the statute. But under *Travelers* neither the statute nor its reading by the state courts would control here.

**7.** If *Glacier* is followed, a proper order can be shaped spelling out State Security's obligations

(if it prevails on the merits) to act as trustee under the constructive trust. Among other things, the anticipated order would deal with the consequences of the reinsurers' possible failure to lay claim to their respective shares of the recovery within the appropriate limitations period.