In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2958 and 99-3050

Midwest Grain Products of Illinois, Inc.,

Plaintiff-Appellant/Cross-Appellee,

v.

Productization, Inc. and CMI Corp.,

Defendants-Appellees/Cross-Appellants.


Appeals from the United States District Court
for the Central District of Illinois, Peoria Division.
No. 95-C-1339--Joe Billy McDade, Chief District Judge.


Argued April 4, 2000--Decided October 3, 2000


  Before Coffey, Rovner, and Diane P. Wood, Circuit
Judges.

  Diane P. Wood, Circuit Judge.  This case presents
a classic contract dispute: A orders a product
from B, and B turns to C to manufacture it. When
A receives the product, it is not satisfied, and
it wants to hold C responsible for the alleged
flaws. We must decide whether there is enough
evidence of some kind of warranty, either express
or as a matter of law, to allow Midwest Grain
Products (Company A) to move beyond summary
judgment in its action against CMI Corporation
(Company C). (Midwest settled its claims against
Productization, Inc. (PI) (Company B), and so
that actor has not been part of this case for
some time.) The district court concluded that
Midwest's evidence was lacking and that CMI was
entitled to judgment as a matter of law. It also
ruled that CMI was not entitled to its attorneys'
fees. Each company has appealed from the part of
the judgment adverse to it, but, finding no error
in the district court's disposition of the
action, we affirm.

I
  On January 12, 1993, Midwest Vice President
Anthony Petricola sent a letter to PI President
Andrew Livingston requesting a quote on grain
dryers to be used in Midwest's expansion of its
facility in Pekin, Illinois. Livingston responded
on January 26 with an offer on PI's behalf to

provide two dryers for a total price of $1,515,800. Midwest accepted PI's offer on February 25, through a purchase order sent to Livingston.

With the deal in hand, PI then turned to CMI to manufacture the dryers. On April 29, 1993, it sent CMI a set of specifications for the dryers Midwest wanted. CMI replied with a fax giving price terms and stating that "[a]cceptance of the order will be subject to receipt by CMI of a letter from Midwest Grain agreeing to make payment, with checks made payable jointly to CMI and Productization." The next day, April 30, PI responded with a purchase order, which also contained various specifications and drawings related to the dryers. Also on April 30, CMI sent a fax to PI confirming receipt of the purchase order and requesting what it called "some minor changes" in the wording of two sections. The first change is unimportant for us, but the second asked again that PI procure a letter from Midwest agreeing to make payments with checks made payable jointly to PI and CMI, and setting out the timing of Midwest's payments.

On May 4, 1993, PI submitted a revised purchase order that reflected PI's commitment to obtain the letter from Midwest that CMI wanted, and that had a page of fine print "terms and conditions." Paragraph 4 was entitled "Warranty," and read as follows:

Seller expressly warrants that all materials and work covered by this order will conform to the specifications, drawings, samples, or other description furnished or specified by Buyer, and will be merchantable, of good material and workmanship, and free from defect. Seller expressly warrants that all the material covered by this order which is the product of Seller or in accordance with Seller's specifications, will be fit and sufficient for the purposes intended.

On May 10, Midwest's Petricola sent the requested letter directly to CMI. The letter commits Midwest to "make payment for equipment purchased by Productization, Inc. from CMI Corporation for its [i.e., Midwest's] project in Pekin, Illinois, with check(s) payable jointly to Productization, Inc. and CMI Corporation." It also mentions the shipment, price, and storage terms of the PI/CMI agreement and states that CMI will issue waivers of liens to Midwest upon CMI's receipt of payment.

This was Midwest's only direct appearance into the dealings between PI and CMI. The latter two companies continued to work out the details of their contract from May through at least the end

of June. On May 14 and 17, CMI sent copies of its equipment sales order to PI. These were essentially order confirmation forms; they detailed the units purchased, price, shipping terms, and other terms of the sale. Then--and this is where our case was born--CMI sent a third "equipment sales order and security agreement" to PI on June 29, 1993. That form mirrored the May 14 and May 17 forms, with two exceptions. The first was a minor downward price adjustment of $260 that concerns no one. The second was the addition of a new page, again filled with fine print, that presented CMI's terms of sale. Paragraph 1 of these terms included the following language: "No other terms are acceptable and any proposed terms or conditions which vary from or are in addition to those contained in this order shall be deemed rejected unless expressly approved by CMI in a writing signed by it." Paragraph 8 addressed warranties, and said in pertinent part:

CMI warrants such equipment, accessories, parts and other goods covered by this order and as are manufactured by CMI against defective material or workmanship for a period of six (6) months after date of first delivery or for one thousand (1,000) hours of use, whichever comes first; . . . . THIS WARRANTY IS EXPRESSLY IN LIEU OF AND EXCLUDES ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED (INCLUDING ANY WARRANTY OF MERCHANTABILITY AND FITNESS OF ANY PRODUCT OR GOODS FOR A PARTICULAR PURPOSE), AND ALL OTHER OBLIGATIONS OR LIABILITIES ON CMI'S PART, AND CMI NEITHER ASSUMES NOR AUTHORIZES ANY OTHER PERSON TO ASSUME FOR CMI ANY OTHER LIABILITY IN CONNECTION WITH THE SALE OF CMI'S PRODUCTS. THERE ARE NOT ANY WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE OF THIS ORDER.

Last, paragraph 11 of the form set forth an integration clause.

After June 29, there were a few more exchanges between PI and CMI. PI sent another purchase order that contained the PI terms and conditions, including its broader warranty language, and CMI sent another equipment sales order, though it is unclear whether the terms of sale page was included that time.

The first dryer reached Midwest in February 1994, but it was not put into service until 1995. The other dryer was delivered in April 1994 and was put into service two months later. Midwest experienced a variety of problems with both units. Initially, CMI and PI serviced them. Midwest found their efforts unsatisfactory, however, and it decided to call in a third party to examine the equipment. Later, still unhappy with PI and CMI, it filed this action in the

district court for the Central District of Illinois, invoking the court's diversity jurisdiction for claims exceeding $75,000. Midwest is an Illinois corporation with its principal place of business in Illinois; PI is a Kansas corporation with its principal place of business there; and CMI is an Oklahoma corporation with its principal place of business also in Oklahoma.

II

We consider first Midwest's appeal from the summary judgment against it. Both Midwest and CMI have devoted a great deal of time in their briefs to discussing issues such as the principles of contract formation, the Uniform Commercial Code's provisions governing a "battle of the forms," see U.C.C. sec. 2-207, and which facts were disputed about these points. We find, however, that this case can be resolved in a more straightforward way. We also conclude that even if certain assumptions are made in Midwest's favor, the district court's judgment was still correct. In conducting this review, we have of course taken any material facts that are in dispute in the light most favorable to Midwest, and we have given de novo consideration to the district court's decision.

A.  Choice of Law

Because this is a diversity case, our first task is to decide under what law we should assess the claims. We begin, as instructed by Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941), with the choice of law rules used by the state in which the federal district court where the case was filed sits--here, Illinois. Illinois follows the Restatement (Second) of Conflict of Laws in making such decisions. See Esser v. McIntyre, 661 N.E.2d 1138, 1141 (Ill. 1996). For cases like this one, the Restatement refers courts either to a choice of law provision in the contract at issue, or to the place of performance. See Philips Electronics, NV v. New Hampshire Ins. Co., 692 N.E.2d 1268, 1278 (Ill. App. Ct. 1998) (contractual choice of law provision); Boise Cascade Home & Land Corp. v. Utilities, Inc., 468 N.E.2d 442, 448 (Ill. App. Ct. 1984) (place of performance).

Either way, we agree with the district court that Oklahoma law governs this case. If the terms included with the June 29 equipment sales order that CMI sent to PI are part of the contract (and no one is disputing that at some point a contract was formed between CMI and PI), this is an open-and-shut matter. Paragraph 10 of the "terms of

sale" states that "[t]his agreement shall be governed and construed in accordance with the laws of Oklahoma." If those terms are not part of the agreement, we look to the place of performance. The CMI/PI contract was one for the manufacture of goods; the manufacturing took place entirely in Oklahoma; and the risk of loss passed from CMI to PI in Oklahoma under the terms of the agreement. Had this case been filed in an Illinois court, we have no doubt that it would have applied Illinois's choice of law rules to select Oklahoma law. The federal courts must do so as well. (We note, incidentally, that this means we will apply Oklahoma's version of the U.C.C. and contract law; Midwest's efforts to persuade us to prefer "uniform" interpretations of the U.C.C. over Oklahoma's rules is reminiscent of the doctrine of general federal common law articulated in Swift v. Tyson, 41 U.S. 1 (1842), and overruled by Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). The Commissioners on Uniform State Laws draft proposed uniform laws for the consideration of state legislatures, but in the end it is the state that enacts the so-called uniform law, with whatever modifications it sees fit to include.)

B. Third-Party Beneficiary

We begin with the question whether, under Oklahoma law, Midwest has any claim to third-party beneficiary status to the agreement between CMI and PI. This may seem a bit like starting a story in media res, but it allows us to evaluate this case on the assumption that Midwest is correct when it argues that the CMI/PI agreement never incorporated CMI's restrictive warranty terms, and thus it enables us to avoid working through the various documents that exchanged hands between the two principal contracting parties.

Under Oklahoma law, a party may be a third-party beneficiary to an agreement only if the contracting parties intended the benefits of the contract to run to the third party. See Great Plains Federal Savings and Loan Ass'n v. Dabney, 846 P.2d 1088, 1093 (Okla. 1993); Copeland v. Admiral Pest Control Co., 933 P.2d 937, 939 (Okla. Ct. App. 1996). In Copeland, the court explained that "[i]t is not necessary that third-party beneficiaries be specifically identified at the time of contracting, but it must appear that the contract was expressly made for the benefit of a class of persons to which the party seeking enforcement belongs." 933 P.2d at 939.

There are only two pieces of evidence in this record that link the CMI/PI contract to Midwest:

first, the fact that CMI knew that PI wanted the dryers so that it could then sell them to Midwest, and second, the fact that CMI insisted that it be paid by checks that Midwest made payable jointly to PI and to itself. Nothing in Oklahoma law the parties have cited, and nothing in Oklahoma law that we have been able to find ourselves, comes close to holding that an ultimate buyer is a third-party beneficiary of every contract its seller enters into with suppliers in order to fulfill the contract. Nor are we referred to, or can we find, any Oklahoma decision indicating that the kind of financial arrangement CMI secured here is enough to give the ultimate buyer third-party beneficiary status. That step was enough to make Midwest a surety for PI, and in that sense it allowed CMI to look not only to PI for payment (a right it had under the basic contract) but also to Midwest. But it did not indicate that the contract was expressly for Midwest's benefit. From CMI's point of view, it was a contract for the sale of goods, and it was not CMI's problem in the final analysis what PI wanted to do with the dryers once it received them.

Indeed, in the section of Midwest's brief entitled "Plaintiff's third-party beneficiary status was ignored or improperly addressed," it cites not a single decision of an Oklahoma court. It refers instead to one Illinois case, Olson v. Etheridge, 686 N.E.2d 563 (Ill. 1997), and one decision from this court in a diversity case governed by Illinois law, Architectural Metal Systems, Inc. v. Consolidated Systems, Inc., 58 F.3d 1227 (7th Cir. 1995). States vary in their approach to rules like those governing the recognition and rights of third-party beneficiaries, and we would at least need some reason to conclude that Oklahoma and Illinois take the same approach before these authorities would be persuasive.

If Midwest was not a third-party beneficiary of the CMI/PI contract, which is our best predication of what an Oklahoma court would find, then it has no case. Because this point did not receive as much attention as it might have at the district court level, however, we address in the alternative the other theories that were litigated more fully.

C.  Contract Formation, Terms, and Modifications

Midwest argues strenuously that the district court overlooked disputed issues of material fact when it granted summary judgment based on the conclusion that the definitive date on which PI and CMI formed their contract was June 29,

through the equipment sales order from CMI bearing that date. The contract might have been formed, it suggests, at any of three earlier times, and critically, at neither of those points had CMI's language excluding warranties entered the picture. One possibility has CMI's April 29 form as the offer, and PI's April 30 fax as the acceptance; a second possibility finds an offer-acceptance sequence in the two April 30 exchanges (the fax from PI to CMI and then the confirmation fax from CMI back to PI); and the third regards the April 30 fax from CMI to PI as the offer and the May 4 purchase order as the acceptance. Midwest points out, correctly enough, that under U.C.C. sec. 2-204 (codified in Oklahoma as 12A Okla. Stat. sec. 2-204; for simplicity we refer to the U.C.C. alone) that "any manner sufficient to show agreement" is enough to form a contract for the sale of goods. Midwest also points out, correctly in our view, that the district court erred to the extent that it thought the facts undisputedly pointed to the June 29 communication as the document that clinched the formation of this contract.

But this is not enough, contrary to Midwest's view, to show that the result the district court reached was in error. The real question is whether the parties to the contract--PI and CMI--chose to limit the warranty CMI was giving, either at the time they contracted or in a later modification. Here too Midwest has problems. Under Oklahoma law, the limitation of warranty language either entered into the contract at the time of its formation, or the parties later agreed to add it. Midwest's assumption that contracting parties cannot modify an agreement if there is a third-party beneficiary whose rights have vested is not supported by Oklahoma law, and thus it cannot defeat later changes that the parties themselves chose to make.

We agree with the district court that the testimony of PI President Livingston, to the effect that "all of the purchase order" PI sent to CMI was part of the deal, is not enough to raise a genuine fact over the question whether PI's warranty terms took precedence over CMI's later limitation. No one directed Livingston's attention to warranties at this point in his deposition. In fact, from the time CMI started performing to the present neither of the parties to the agreement thought that PI's original language survived. Without more, this was too slender a reed to require jury resolution of the question.

We would reach the "battle of the forms" question, which is governed by U.C.C. sec. 2-207, only if the June 29 order is either the offer or

the acceptance. The U.C.C. does not give a clear answer about the way courts must handle contradictory terms (as opposed to "additional" terms, see sec. 2-207(2)). Given that fact, and our finding earlier that Midwest is not a third-party beneficiary in any event, we prefer to leave this problem for resolution in the Oklahoma courts in a case where it matters. For what little it is worth, we think it likely that Oklahoma would take the same approach for different terms as it does under U.C.C. sec. 2-207(2)(a) for additional terms: that is, it would not incorporate the new terms into a contract between merchants where one form explicitly limits acceptance to the terms of the offer. Here, CMI's form explicitly says that "[n]o other terms are acceptable and any proposed terms and conditions which vary from or are in addition to those contained in this order are deemed rejected." If that is correct, then Midwest has no case under this theory either.

Suppose, however, that a jury might conclude that one of the earlier potential contracts was the governing agreement. Here again, Midwest wins only if the parties had no power to make later changes that disfavored (the assumed) third-party beneficiary. Midwest argues that they did not, relying on the Restatement (Second) of Contracts sec. 311(3), under which the principal parties' power to modify the terms of an agreement ends when the third-party beneficiary "manifests assent to it at the request of the promisor or promisee." This is what Midwest did when it sent the May 10 letter concerning the payment terms, it claims.

The problem here for Midwest, once again, is that Oklahoma law governs this case. Oklahoma has not adopted sec. 311 of the Restatement (Second) of Contracts as its law. Indeed, as a general matter the Oklahoma courts do not seem to be inclined to adopt rules from the Contracts Restatement, perhaps because Title 15 of the Oklahoma Code is a comprehensive legislative statement of the law of contracts in that state. Oklahoma law says only that "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." 15 Okla. Stat. sec. 29 (1996). Nothing in this language suggests that Oklahoma has limited the power of the principal parties to modify their agreement. Even if Midwest is correct, therefore, that there was once an agreement with no limitation of warranties and the parties later modified it, it had no right to prevent that modification and thus no claim today against CMI.

D.  Breach of Contractual Warranties

Last, and briefly, Midwest alleges a breach of CMI's express six-month warranty to PI. It claims that CMI was unable or unwilling to correct existing problems. What it does not explain, however, is what kind of defect in materials or workmanship caused the drums to be unsatisfactory. The express warranty extended only to such defects. It was also limited to the buyer and was "not assignable or otherwise transferrable." If we regard PI as the buyer, then Midwest was excluded by the latter language and there was no breach of the express warranty. If, perhaps because of the payment clause, we regard Midwest as a joint buyer, then Midwest still loses because of its failure to point to evidence showing defects in materials or workmanship.

In the final analysis, the party that Midwest needed to pursue was its seller, PI. Indeed, it did include PI in this action at the outset. The terms of its settlement with PI are not pertinent to its case against CMI and are not in any event a matter of record. We hold only that, under the facts as presented and the governing law, the district court correctly granted summary judgment in the case Midwest wanted to bring against CMI.

III

Having won before the district court, CMI now wants more, in the form of its attorneys' fees. Its claim rests on an Oklahoma statute, 12 Okla. Stat. sec. 936, which provides:

In any civil action to recover on [a] contract relating to the purchase or sale of goods . . . unless otherwise provided by law or the contract which is the subject of the action, the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

The district court decided that this statute was not applicable, because for purposes of attorneys' fees it was required to follow Illinois rules, and Illinois has no such statute. This decision is the basis of CMI's cross-appeal.

We agree with the district court that we must begin once again with the question of choice of law. It is especially important in doing so to avoid the common terms "substantive" and "procedural." As a shorthand matter, courts and lawyers often say that the Rules of Decision Act, 28 U.S.C. sec. 1652, coupled with Erie, requires federal courts to apply "substantive" state law in diversity cases, while they continue to use

federal "procedural" law by virtue of the Rules Enabling Act, 28 U.S.C. sec. 2072, and Supreme Court decisions such as Hanna v. Plumer, 380 U.S. 460 (1965). But some things do not lend themselves readily to such categories. A statute of limitations, for example, is the kind of issue that state law governs, see, e.g., Walker v. Armco Steel Corp., 446 U.S. 740 (1980), but the internal state system might consider it "procedural" for other purposes. Cf. Sun Oil Co. v. Wortman, 486 U.S. 717, 726 (1988) (rejecting notion that there is "an equivalence between what is substantive under the Erie doctrine and what is substantive for purposes of conflict of laws"). We think it more accurate, therefore, to ask the question to whom has the authority to make certain decisions been allocated, under the various statutes and decisions (and their kin) that we have just mentioned.

With respect to attorneys' fees, it is clear that there is no federal statute or procedural rule that would give either party a right to fees in a case like this one. The Tenth Circuit, which has frequently been called on to determine the applicability of the Oklahoma statute at issue here in diversity cases, has routinely held, applying Erie, that the statute's applicability should be determined under the law of the forum state. See, e.g., Boyd Rosene & Assoc., Inc. v. Kansas Municipal Gas Agency, 174 F.3d 1115, 1118 (10th Cir. 1999) ("[E]ven though attorney's fees are substantive for diversity purposes, they are not thereby necessarily substantive under [the forum state's] choice-of-law rules."); Hefley v. Jones, 687 F.2d 1383 (10th Cir. 1982). We are persuaded that this approach is correct.

We therefore turn once again to Illinois law, under Klaxon, and ask where Illinois thinks this decision should be made. If Illinois regards attorneys' fees as the kind of thing that should follow the law of the contract, then it would look to the Oklahoma fee statute; if instead Illinois regards attorneys' fees as an aspect governing use of the judicial system (i.e. "procedural"), then an Illinois court hearing this case would follow Illinois rules on fees regardless of what Oklahoma had to say.

Aside from the general reference to Oklahoma's law, the contract is silent on the issue of attorneys' fees. (If fees were specifically addressed, of course, that would be a different matter, and both Oklahoma and Illinois would follow the parties' agreement. See, e.g., In re Adoption of K.M.S., 997 P.2d 856, 857 (Okla. Ct. App. 1999); Hofmeyer v. Willow Shores Condominium Ass'n, 722 N.E.2d 311, 315 (Ill. App. Ct. 1999).) In our view, that reference alone is not enough

to answer the question before us. The parties obviously could not impose the Oklahoma rules of civil procedure on a foreign court, nor could they require a foreign court to recognize certain items as compensable costs, using the term as 28 U.S.C. sec. 1920 does, even if Oklahoma chooses to do so.

Illinois follows its own law in determining whether an issue is substantive or procedural (or, more accurately, whether authority to decide it should be allocated using the choice of law rules for primary conduct or should be retained by the Illinois courts). See Boersma v. Amoco Oil Co., 658 N.E.2d 1173, 1180 (Ill. App. Ct. 1995). Under Illinois law, a rule is considered "procedural" unless "the primary purpose of the . . . rule . . . is to affect decision of the issue rather than to regulate the conduct of the trial." Id. If a rule "affect[s] only the remedy available and not the substantive rights of the parties," it is considered procedural. Cox v. Kaufman, 571 N.E.2d 1011, 1015 (Ill. App. Ct. 1991). Rules governing the award of attorneys' fees do not affect the substantive rights of the parties; rather, they are closer to rules that regulate the conduct of the trial or affect the remedy available, so it is likely that Illinois would consider these rules to be procedural rather than substantive.

Analysis of Illinois's treatment of attorneys' fees in other contexts lends additional support to this conclusion. Illinois characterizes attorneys' fees as procedural for retroactivity purposes, and so it applies new fee statutes to pending cases. See Songer v. State Farm Fire and Casualty Co., 414 N.E.2d 768, 772 (Ill. App. Ct. 1980). Even in cases in which another state's law governs the substantive issues, the Illinois courts have applied Illinois law to decide whether to award attorneys' fees as a sanction for frivolous litigation. See Olsen v. Celano, 600 N.E.2d 1257 (Ill. App. Ct. 1992). Other cases and contexts also indicate that Illinois views fees as a fundamental part of the judicial system and thus would not allocate authority for deciding whether they are recoverable to the law of another state. See House of Vision, Inc. v. Hiyane, 245 N.E.2d 468, 472 (Ill. 1969); Miller v. Pollution Control Board, 642 N.E.2d 475, 485 (Ill. App. Ct. 1994); Waller v. Board of Education of Century Community Unit School Dist., 328 N.E.2d 604, 608 (Ill. App. Ct. 1975). The common theme in these cases appears to be the courts' insistence that the Illinois legislature must have authorized the award of fees. Illinois also follows the American rule, under which parties normally bear their own legal costs.

While the question is not free from doubt, that is not unusual in diversity cases. It is our best guess that an Illinois court hearing the identical case would refuse to follow Oklahoma's attorneys' fee statute, even in a contract case governed by Oklahoma law. We therefore affirm the judgment of the district court on CMI's cross-appeal.

IV

The judgment of the district court is Affirmed in all respects. Costs on appeal will be taxed against Midwest.